WOODHULL, Plaintiff in error, v. STATE, Defendant in error. [Two cases.]

*Nos. State 132, 133. Argued May 9, 1969.—Decided June 6, 1969.*
(Also reported in 168 N. W. 2d 281.)

For the plaintiff in error there was a brief by *Atinsky, Kahn & Sicula* and *Paul E. Sicula,* all of Milwaukee, and oral argument by *Paul E. Sicula.*

For the defendant in error the cause was argued by *Bruce C. O'Neill,* assistant district attorney of Milwaukee county, with whom on the brief were *Robert W. Warren,* attorney general, *William A. Platz,* assistant attorney general, and *E. Michael McCann,* district attorney.

CONNOR T. HANSEN, J. In April, 1967, the sixty-two year old Ruder lived in a room above a tavern at 6409

West Greenfield avenue. Twelve to fifteen other men lived in rooms above the tavern.

At about 3:30 a. m. on April 10, 1967, one of the roomers above the tavern went to the lavatory which was located directly across from Ruder's room. He smelled smoke coming from the victim's room, opened the door, and discovered the victim lying on the floor.

An investigation by the West Allis police followed. Inside Ruder's room there were rags piled up directly inside the door across the jamb. There was a small pile of clothing smoldering in the middle of the room. Items were strewn about the room, and the drawers of Ruder's dressers were open. There was an open wallet on the bed with its contents strewn about.

Ruder was lying face down on the floor with his feet against the door and a pool of blood about his head. He had numerous cuts and bruises on his head. His hands were behind his back with two neckties joined together tied around his right wrist. The left wrist was not tied, but was close to the right wrist as though the two wrists had been tied together at one time.

There was a 2″ x 2″ piece of wood with blood stains on it lying on the bed. This piece of wood proved to be one-half of the landlady's clothes pole which she kept in her yard at the rear of the premises. The other half of the clothes pole was found that same morning.

Six police officers who were involved in the investigation of the crime testified, in essence, that they were unable to uncover any clues which would point to a suspect. A roomer who lived two doors down the hall from Ruder said that he was home during the apparent time of the crime and heard and saw nothing. The police investigation revealed that none of the roomers above the tavern whom they questioned had heard anything, seen any strangers, or offered anything that could implicate anyone.

Dr. Helen Young, the Milwaukee county medical examiner, performed the autopsy on Ruder and was of the

opinion that Ruder's death was caused by one or more blows to the head and these blows could not have been self-inflicted. Dr. Young testified that she could not be certain when Ruder died.

Testimony concerning the defendant's activities and Ruder's activities on April 9 and 10 was also presented. The defendant lived above a tavern about three blocks from where Ruder lived. Ruder and the defendant frequented some of the same taverns. There is nothing in the record to indicate that Ruder and the defendant knew each other.

Mrs. Bitters, whose husband owned Ken's Inn (a tavern located in Ruder's neighborhood) testified that she was tending bar on Sunday, April 9. Ruder came into the tavern about 2 p. m. that day and left at about 4 p. m. During that interim the defendant entered the tavern with another man (not Ruder) and left again at 10 p. m. to get something to eat.

While Ruder and the defendant were in the tavern, Mrs. Bitters was having difficulty getting Ruder to pay for his drinks. She threw up her hands and made a statement, not directed to anyone in particular, that "Here is a man [Ruder] that has a lot of money but he doesn't pay for his drinks." The remark was not directed at the defendant, and fifteen or twenty other persons were in the bar at the time.

The defendant returned again at 11:40 p. m. Mrs. Bitters refused to serve him because he was trying to pick a fight with a man at the bar and he already had too much to drink. The defendant left about midnight.

Mrs. Bitters, and one of the men who roomed above the tavern where Ruder lived, testified that Ruder bragged about his money a lot. He did his bragging in front of strangers as well as friends.

The proprietor of Erceg's Super Bar testified that Ruder left his tavern, which was located in Ruder's neighborhood, at 10 p. m. on April 9, when the proprietor closed the place. There is no accounting of Ruder's ac-

tivities from 10 p. m. on April 9, until his body was found at 3:30 a. m. on April 10.

Natale Pellegrini, the owner of Pasquale's Hall, the tavern over which the defendant roomed, testified that the defendant had a beer in his tavern between 7 and 8 o'clock p. m. on April 9, left, and then returned after midnight. Pellegrini asked the defendant for some rent money. The defendant then used the phone. Pellegrini testified that he did not pay any attention to what the defendant said on the phone, but he did hear the defendant say he was in some sort of trouble. The defendant then left. There is no accounting for the defendant's time after he left Pasquale's Hall. The defendant did not testify at the trial.

Sometime on April 10, 1967, the defendant was placed in the Milwaukee county jail on an unrelated offense. Two witnesses for the state testified as to conversation they had with the defendant while they were in the same cell block with him. His conviction was predicated on the testimony of these two men.

On this appeal, the defendant raises nine issues.

### I.

#### Sufficiency of the Evidence.

The defendant argues that the evidence adduced at trial was insufficient to prove the defendant's guilt beyond a reasonable doubt.

The credibility of the two inmate-informers and other witnesses was particularly a question for the jury, an analysis of the evidence leads to the conclusion that the jury could properly have found the defendant guilty beyond a reasonable doubt.

The defendant's informer-jail mates were Mr. Wild and Mr. Smith. Wild had been convicted of a crime three times and Smith seven times.

The defense contends that Wild and Smith obtained their information from newspaper articles and not from the defendant. The defendant also points out some discrepancies between the Wild version and the Smith version. The defense presented two witnesses, Wendell Weidelmann and George Mouzis (or Mouizes), who were in the same jail tier with Smith, Wild, and the defendant on April 10 and 11, 1967. They testified that they and others read a newspaper article concerning Ruder's death which was discussed, and that they at no time heard the defendant make any statement implicating himself in Ruder's death.

Wild testified that he, the defendant, Smith, and an unidentified man were together in a cell on Monday, April 10, and that about 2 or 3 in the afternoon the defendant related his story. Wild testified that either that night or the next morning he read in the newspaper about Ruder's death. The article was discussed by the cell mates and the defendant allegedly went more into detail as to what he had done.

On April 11 or 12, 1967, Captain Thompson and other officers of the West Allis police department came to the jail to question Wild about his involvement in a burglary. Wild then told them about the defendant's statement. When the police acted like they were going to charge Wild with Ruder's death, Wild told them to talk to Smith who could corroborate his story. Wild was then removed from the cell block and did not converse with the defendant again. The record does not indicate whether Wild talked to Smith after relating the story to the West Allis police.

The next day the West Allis police officers returned and Wild's statement was reduced to writing.

Smith testified that the conversation with the defendant took place after supper, in the evening of April 10, 1967. The next day he was removed to the house of correction to serve a term for drunk and disorderly con-

duct. On April 13, 1967, Captain Thompson and another West Allis police officer questioned him about the defendant's confession. Smith then made a statement in writing. Smith testified that he did not read any newspaper article about Ruder's death and that the conversation took place before the evening paper arrived.

The following is an abridgment of Smith's testimony as to some of the details of the alleged conversation with the defendant:

He followed the guy home. He knew the guy had a lot of money. He hid in the lavatory and smoked a cigarette or two, and waited for the guy to go to sleep. There was some kind of wooden panel on the door to the guy's room and he loosened one end of it enough to get his hand in. He opened the panel up to see if the guy was sleeping. He then went outside. He got ahold of a clothes pole. He broke off an end and went back. He unlocked the door and reached over the guy. The guy woke up and he started hitting the guy with the club. He took the man's wallet; took the money. The man was on the floor bleeding and he tied the man up with some ties. Just before he left he checked to see if the man was still alive because there was a lot of blood. He thought he hurt the guy pretty bad. So then he untied the ties loose enough so if he did wake up, he'd be able to move around, and then he left and went to another tavern.

Wild's story adds the following:

The defendant let the guy go first into the building where he lived. He didn't know where the guy stayed, which room he was in, so he knocked on a door. "He asked the guy there where Mr. Ruder was, said he was his nephew from out of town, had come to visit him." The guy told him where Ruder's room was so the defendant went down, pushed the panel in on the door and saw that there was a light on. Then he went to the lavatory and waited.

"He found the man's wallet and he took the money out, threw the wallet on the bed. . . . the blood started running underneath the door, so he took some rags and some papers, threw them in front of the door so the

blood wouldn't run out. Then he left the club there and he went home. He said he got home about four o'clock in the morning."

The defendant's theory is that Wild and Smith fabricated the story after reading newspaper reports of Ruder's death in order to get special dispensation from the police officers. Wild and Smith denied this and the record is devoid of any showing that they received any benefits from telling their stories. The testimony of Wild and Smith is far more detailed than the newspaper reports, and they related facts which only could have been known to the defendant.

Some of the facts testified to by Smith and Wild and corroborated by other testimony at the trial, but not appearing in the newspaper articles, include the availability of the lavatory as a hiding place; that the club found was a clothes pole; that more than one necktie was used to tie up Ruder; that rags were piled up against the door jamb in Ruder's room; and that the door panel was pushed in so that one could unlock Ruder's door from the outside.

We are of the opinion that the evidence adduced, believed and rationally considered by the jury, was sufficient to prove the guilt of the defendant beyond a reasonable doubt. *State v. Stevens* (1965), 26 Wis. 2d 451, 463, 132 N. W. 2d 502.

## II.

### *Confession or Admission?*

The defendant contends that his alleged conversation with Wild and Smith constituted an admission and not a confession, and therefore the trial court erred in instructing the jury on confessions instead of on "admissions against interest."

We think that the defendant's statements to Wild and Smith constituted a confession and therefore the trial court properly so instructed the jury.

In *State v. Cartagena* (1968), 40 Wis. 2d 213, 161 N. W. 2d 392, this court indicated that the distinction between a confession and an admission is that in the former there must be acknowledgment of guilt, while in the latter there is no such acknowledgment.

" '. . . A confession is a voluntary admission or declaration by a person of his agency or participation in a crime. . . . To make an admission or declaration a confession, it must in some way be an acknowledgment of guilt. . . .' " *Cartagena, supra,* page 218.

29 Am. Jur. 2d, *Evidence,* p. 575, sec. 523, states the following:

"While a confession is an admission of guilt by a party charged with a crime, it is a special kind of admission. Although every confession is an admission, not every admission is a confession. There may be an admission of some fact in issue without its being an admission of guilt of the crime charged. A confession is an admission of the criminal act itself, not an admission of a fact or circumstance from which guilt may be inferred. . . ."

Thus, since the defendant admitted guilt in his statement to Wild and Smith, it constituted a confession and the trial court properly instructed the jury on confessions.

### III.

### State's Hostile Witness.

The state called one Merle Brydon, an inmate at the state prison at Waupun, as a witness to testify concerning a confession of the defendant to him. However, Brydon would not so testify. The state then had marked

for identification a statement given by the witness to the state on November 10, 1967, and showed it to the witness to refresh his recollection.

At this point proceedings were held outside of the presence of the jury and the trial judge determined that at the time Brydon made the above statement, Brydon was under the impression that it would never be used. The judge ruled that on this basis the statement could not be introduced at the trial. The trial judge then declared a recess until the following morning and the jury was excused.

After the jury departed, Brydon said the following:

"Yes. Also, that the District Attorney threatened me this morning, that he said he called the Director of Corrections and that I wasn't going to be sent to the Camp."

The district attorney then explained that he did speak to Brydon that morning.

*"The Court:* I think you told me, you said that, as I understand it, while the D. A.'s Office doesn't control the place where these men serve their time, that you would accede to the witness' request, if possible, that he be transferred to Camp.

"[*The district attorney*] : I did tell him that, that I would be happy to call Mr. Powers if he was worried about any repercussion."

The defense counsel then questioned Brydon and Brydon stated that he was under the impression that if he testified a certain way he would go to "Camp" and if not, he would return to Waupun. Brydon indicated that in his mind he was threatened or coerced into testifying.

The trial judge then stated:

"My impression was that the witness didn't want to testify, then go back to Waupun. The state said if they could help him to see he wouldn't have to go back, they would do whatever they could."

The next morning before continuation of the trial, the defense requested that it be allowed to bring out from Brydon that he was threatened, without opening the door to bring in Brydon's written statement. The trial judge declined to let Brydon so testify.

The trial court then told the jury that it was excusing the witness because whatever statement the witness did make was made under the witness' impression that such statement would not be used in evidence.

On appeal, the defendant argues that the court erred in refusing an instruction to make the jury aware of the fact that Brydon had nothing to offer in the way of fair and impartial testimony. Defendant also argues it should have been permitted to bring out Brydon's assertions of coercion which could lead to the inference that Smith and Wild were likewise intimidated.

We are of the opinion that the trial court took the proper view of this situation. Brydon was not a defendant, his written statement was inadmissible, and, therefore, there was nothing for the defense to impeach. Furthermore, Brydon was not called as a witness for the defense. On the morning of the day Brydon was to testify he indicated to the prosecuting attorney that he didn't want to testify and then return to prison because of possible repercussions in the event the defendant was convicted and sent to the same institution. The prosecuting attorney then told Brydon he would do what he could to see that he was sent to a different institution. The testimony on this question was taken in the absence of the jury.

The defendant claims it is prejudicial error to refuse the admission of such testimony in the trial. We are satisfied beyond a reasonable doubt that refusal to receive such testimony into evidence was not prejudicial to the cause of the defendant.

## IV.

*Police Officer's Offer of Consideration To A Witness.*

The defense attempted to elicit testimony from George Mouzis, one of its two witnesses, that a Detective Thompson of the West Allis police department had offered him "some sort of deal or bargain or walking papers if he would turn state's evidence against Dennis Woodhull and say that he confessed to the crime in question." Mouzis was an inmate with the defendant, Smith and Wild in the Milwaukee county jail at the time of the defendant's alleged confession.

The trial court sustained the state's objection to any such testimony on the basis that it was hearsay and that the defendant could have subpoenaed Detective Thompson to bring out such testimony. Thompson was out of the state at the time of the trial.

The state now concedes that the testimony of Mouzis would not be hearsay because it would not be offered to prove the truth of the fact asserted, but only offered so that the finder of fact might consider the statement's effect on the hearer. *Auseth v. Farmers Mut. Automobile Ins. Co.* (1959), 8 Wis. 2d 627, 630, 99 N. W. 2d 700.

The question before this court then becomes whether the refusal to admit this testimony into evidence was prejudicial to the cause of the defendant. The only possible probative value of the admission of this testimony would be to infer that because the police were alleged to have made these statements to Mouzis, they might also have done so to Wild and Smith. There is nothing in the record which would tend to indicate such a probability. The defense counsel extensively, and to no avail, cross-examined both Wild and Smith concerning any type of arrangement they might have made with the police officers to secure their testimony in this case. Furthermore, Wendell Weidelmann, witness for the defendant,

testified that the police also had discussed the case with him and had offered no inducement whatsoever for his testimony.

While this particular testimony of Mouzis could properly have been admitted into evidence, we are satisfied beyond a reasonable doubt that the failure to do so does not reach such constitutional proportions as to constitute prejudicial error.

"Errors, if any, committed during the course of the trial should not serve to overturn a judgment ' "unless it appears pretty clearly that had they not occurred, the result might probably have been more favorable to the party complaining." ' " *Dascenzo v. State* (1965), 26 Wis. 2d 225, 236, 132 N. W. 2d 231.

## V.

### *Pretrial Discovery.*

The defendant made various pretrial discovery motions which were denied. The defendant sought, among other things, access to some of the investigation reports and the criminal and psychological background of Wild and Smith.

A defendant has no right to pretrial discovery in a criminal proceeding. *State ex rel. Johnson v. County Court* (1968), 41 Wis. 2d 188, 193, 163 N. W. 2d 6.

## VI.

### *Testimony of Medical Examiner.*

The defendant argues that Dr. Young, the medical examiner who performed an autopsy on Ruder, invaded the province of the jury when she testified that in her opinion Ruder's death was the result of a homicide. Dr. Young defined a homicide as being "the taking of an individual's life by another individual."

The defense objected to Dr. Young's statement and a conference was held in chambers. Defense counsel argued that Dr. Young's testimony was not proper because her conclusion that a homicide was involved did not arise from any scientific or special analysis.

The defense was then permitted to examine Dr. Young before the jury, whereupon Dr. Young stated that based upon her examination of Ruder she could only conclude that the cause of death was due to a blow or blows.

The trial court then ordered Dr. Young's previous answer with regard to the term and definition of homicide stricken and instructed the jury to disregard it.

This court has often noted that the prejudicial effect of improper testimony may be cured by the trial court ordering that it be stricken and instructing the jury to disregard the testimony. *Bosket v. State* (1966), 31 Wis. 2d 586, 598, 599, 143 N. W. 2d 553.

There was clearly no prejudicial error with respect to Dr. Young's testimony.

## VII.

### Results of Crime Lab Tests.

During the trial the defendant contended that he should be permitted to make the jury aware that the state crime laboratory, after running tests on all the physical evidence in the case, could not connect the defendant with the crime. However, the defendant did not wish the entire report introduced because it included clothing of the *defendant* which had certain inconclusive stains on it.

The crime lab tests were favorable to the defendant only in that they were inconclusive. The tests in no way exculpated the defendant or inculpated anybody else. To have allowed only the defendant's construction of the results of the tests to go before the jury would have been misleading, and the trial court properly denied their admission.

## VIII.

### *Interest of Justice.*

In *Lock v. State* (1966), 31 Wis. 2d 110, 118, 142 N. W. 2d 183, we stated the rule governing the granting by this court, pursuant to its discretionary power under sec. 251.09, Stats., of a new trial in the interest of justice in a criminal case:

". . . it should clearly appear from the record that for some reason it is probable there has been a miscarriage of justice. In order for this court to exercise its discretion and for such a probability to exist we would at least have to be convinced that the defendant should not have been found guilty and that justice demands the defendant be given another trial."

The jury had all the witnesses before it and chose to believe those of the state. We are not convinced that justice has been miscarried in this case. Also, in this case the trial court heard and denied motions to set aside the verdict and in the alternative to grant a new trial.

## IX.

### *Constitutionality of Sec. 958.06, Stats.*

The defendant also argues that sec. 958.06 (3) (a), Stats.¹ is unconstitutional. The reason being, in the event the defendant is granted a new trial he could be convicted of first-degree murder even though he was acquitted of

---

¹ "958.06  New trial; sentence; service of affidavits; writ of error.

". . . .

"(3) (a) A new trial shall proceed in all respects as if there had been no former trial. On the new trial the defendant may be convicted of any crime charged in the indictment or information irrespective of the verdict or finding on the former trial. The former verdict or finding shall not be used or referred to on the new trial."

218

that particular charge in the instant trial. We have affirmed the judgment of conviction and, therefore, do not reach this issue.

*By the Court.*—Judgment and order affirmed.