HART, Plaintiff in error, v. STATE, Defendant in error.

*No. 75–604–CR. Argued October 7, 1976.*
*—Decided January 18, 1977.*
(Also reported in 249 N. W. 2d 810.)

374

376

For the plaintiff in error there was a brief and oral argument by *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *David J. Becker,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

ABRAHAMSON, J.

## FACTS

Shortly before four o'clock on the afternoon of June 12, 1974, David Weidner, age sixteen, was killed while riding his bicycle in the town of Sullivan, Jefferson county, when he was struck by an automobile driven by the defendant Richard C. Hart. Prior to the accident both the defendant and the victim were proceeding west on Highway 18, the victim riding his bicycle along the right-hand edge of the roadway. Just before the impact,

the Weidner boy turned left, apparently intending to enter Highland Drive. He was struck by the defendant's vehicle, which was just in the process of overtaking him near the intersection and he was thrown three or four feet off the pavement south of the road. The parties stipulated to the fact of the collision and to the fact that as a result of the collision the victim died immediately or within minutes thereafter.

As a result of the accident defendant was charged with violation of sec. 940.08, Stats., which provides:

"(1) Whoever causes the death of another human being by a high degree of negligence in the operation or handling of a vehicle, firearm, airgun, knife or bow and arrow may be fined not more than $1,000 or imprisoned not more than one year in county jail or both.

"(2) A high degree of negligence is conduct which demonstrates ordinary negligence to a high degree, consisting of an act which the person should realize creates a situation of unreasonable risk and high probability of death or great bodily harm to another."

The case was tried to a jury on October 4 and 8, 1974. After deliberating slightly over an hour, the jury returned a verdict of guilty. Motions after verdict were heard and denied on November 19, 1974, and on December 3, 1974, a judgment of conviction was entered, by which the defendant was placed on two years' probation subject to the condition that he be incarcerated in the Jefferson county jail for six months. In addition, defendant's driving privileges were revoked for one year.

Defendant appealed his conviction to the circuit court, which affirmed the conviction by decision rendered June 16, 1975, and order dated July 7, 1975. It is that order which is here upon a writ of error.

Defendant contends here, as he did in both the courts below, that the county court committed error in allowing certain testimony as to the defendant's driving before

reaching the scene of the accident and as to the defendant's driving practices in general and that the evidence was insufficient to sustain the verdict. Additional facts will be discussed below.

## ISSUES

A. Did the county court err in receiving the testimony of Nelson, Jaeger and Hoffman relating to the defendant's driving en route to the scene of the accident?

B. Did the county court err in allowing Hoffman to testify on redirect examination concerning defendant's driving practices for a three-month period prior to the accident?

C. Was there sufficient credible evidence to allow the jury to find that the defendant drove with a high degree of negligence and that such negligence caused the death of David Weidner?

*Homicide by Negligent Use of Vehicle.*

Before we discuss the issues raised by the defendant we should analyze the nature of the offense under sec. 940.08, Stats.

Sec. 940.08, Stats., is the latest in a series of legislative solutions to the problem of fashioning a suitable criminal statute to deal with death caused by conduct which, notwithstanding its accidental nature, the legislature believes to be sufficiently blameworthy to merit punishment as a public offense.[1] The earliest attempt was a statute

[1] For a discussion of the history of criminal negligence provisions in this state and elsewhere, *see* Remington and Helstad, *The Mental Element in Crime—A Legislative Problem,* 1952 Wis. L. Rev. 644, 658–664; Riesenfeld, *Negligent Homicide—A Study in Statutory Interpretation,* 25 Cal. L. Rev. 1 (1936). *See also* O'Connell, *Reckless Driving—Prosecution and Defense,* 1958 Wis. L. Rev. 210; *State v. Wickstrom,* 14 Wis.2d 416, 111 N.W.2d 176 (1961).

defining fourth-degree manslaughter, which was held by this court to require only ordinary negligence. *Clemens v. State,* 176 Wis. 289, 185 N.W. 209 (1922). The court expressed strong misgivings about the wisdom of such a statute, however, and suggested to the legislature that it be amended to require gross negligence. The suggested change was made, and the amended statute was considered by the court in *Bussard v. State,* 233 Wis. 11, 288 N.W. 187 (1939), a case in which the defendant had, through what appeared to be pure inattention, collided with a stopped vehicle and killed one of its occupants. This court reversed the conviction because the evidence failed to show gross negligence which requires some subjective realization on the part of the defendant.

"His failure to make any observation during the time it took him to travel approximately four hundred feet indicates quite strongly that *the defendant was negligent in a high degree.* However, we find no evidence of wantonness or willfulness." (Emphasis supplied.) 233 Wis. at 15.

Gross negligence (which is now incorporated in sec. 940.06, Stats., Homicide by Reckless Conduct) requires a subjective intent as an element of the offense. In *Bussard* and *Clemens,* the court used the following definition of gross negligence from *Jorgenson v. Chicago & N.W. Ry.,* 153 Wis. 108, 116, 140 N.W. 1088 (1913):

". . . Gross negligence has received a very certain and definite meaning in the jurisprudence of this state . . . . It is not inadvertence in any degree; there must be present either wilful intent to injure or that wanton and reckless disregard of the rights of others and the consequences of the act to himself as well as to others which the law deems equivalent to an intent to injure."

Shortly after *Bussard,* in 1941, the legislature enacted sec. 340.271(2), which provided in part:

"Any person who, by the operation of any vehicle at an excessive rate of speed or in a careless, reckless or negligent manner constituting or amounting to a high degree of negligence, but not wilfully or wantonly, shall cause the death of another . . . ."

Though the new statute contained no definition of "high degree of negligence," it is apparent that the legislature intended sec. 340.271(2) as a retreat from the subjective standard of gross negligence.

Remington and Helstad conclude that sec. 340.271(2) applied to the defendant's conduct the same standard of care as that for ordinary negligence—*i.e.,* an objective "reasonable person" test—but attached liability only where harm to which others are thereby exposed is of a particularly serious probable nature.[2]

---

[2] Remington and Helstad, *supra,* note 1, at 660, state:

"The legislature, apparently concerned about the difficulty in convincing juries of the presence of subjective realization, particularly in cases involving motorists, enacted [sec. 340.271(2)] which was designed to strike a compromise between ordinary negligence and the subjective requirement of gross negligence. *The statute incorporates the phrase 'high degree of negligence' which, as interpreted, involves the objective standard of ordinary negligence but requires that a more serious risk be created. It is conduct that not only creates an unreasonable risk of bodily harm to another, but also involves a high degree of probability that substantial harm will result to such other person.*

"Of interest here, is the interplay between the court and the legislature, both striving for an acceptable basis for liability. At the outset there is the court's determination that ordinary negligence is too harsh a standard and therefore the suggestion that a subjective mental state be required. This is followed by a legislative determination that, at least as to automobiles, the objective standard is the proper one." (Emphasis added.)

Since the authors spoke of the statute "as interpreted," they presumably had in mind this court's decision in *State ex rel. Zent v. Yanny,* 244 Wis. 342, 12 N.W.2d 45 (1943). In that case the term "high degree of negligence" was defined as follows:

"It is considered that the negligence requisite for a conviction under sec. 340.271(2), Stats., is substantially and appreciably

■ Sec. 340.271(2), Stats., remained on the books until the general revision of the criminal code in 1955[3] which created the present sec. 940.08, Stats. When the legislature enacted sec. 940.08, it created for the first time a statutory definition of "high degree of negligence":

"(2) A high degree of negligence is conduct which demonstrates ordinary negligence to a high degree, consisting of an act which the person should realize creates a situation of unreasonable risk and high probability of death or great bodily harm to another."

This definition appears to follow the interpretation of the term suggested by Remington and Helstad. In *Osborne v. Montgomery*, 203 Wis. 223, 242, 234 N.W. 372 (1931), this court after an extended discussion of the matter, suggested the following instruction to define negligence:

"Every person is negligent when, without intending to do any wrong, he does such an act or omits to take such a precaution that under the circumstances present he, as an ordinarily prudent person, *ought reasonably to foresee that he will thereby expose the interests of another to an unreasonable risk of harm.* In determining whether his conduct will subject the interests of another to an unreasonable risk of harm, a person is required to take into account such of the surrounding circumstances as would be taken into account by a reasonably prudent person and possess such knowledge as is possessed by an ordinarily reasonable person and to use such judgment and discre-

---

higher in magnitude than ordinary negligence. It is negligence of an aggravated character. It is great negligence. It represents indifference to legal duty. It is conduct that not only creates unreasonable risk of bodily harm to another, but also involves a high degree of probability that substantial harm will result to such other person. In other words, the culpability which characterizes all negligence is magnified to a higher degree as compared with that present in ordinary negligence. On the other hand, it is something less than wilful and wanton conduct which, by the law of this state, is the virtual equivalent of intentional wrong." 244 Wis. at 347.

[3] Ch. 696, Laws of 1955.

tion as is exercised by persons of reasonable intelligence and judgment under the same or similar circumstances." (Emphasis added.)

*See also* Wis. J.I.—Criminal 375, "Negligence Defined." Thus it is apparent that the statutory definition of a high degree of negligence consists of the standard definition of ordinary negligence with the additional element of "a high probability of death or great bodily harm" as a result of the culpable act. The high degree of negligence is distinguished not by any different mental state on the part of the actor, but by the existence of a high probability of death or great bodily harm as measured by the objective reasonable person test.

The fact that a purely objective standard was intended is confirmed by the comments contained in the Judiciary Committee Report on the Criminal Code (Wisconsin Legislative Council, 1953).[4]

---

[4] "The difference between a high degree of negligence and ordinary negligence is one of degree. The primary function of the ordinary negligence concept is determining whether a person should be required to pay damages. The function of the negligence concept in the criminal law is in determining the sort of conduct which is, although inadvertent, sufficiently dangerous to warrant criminal sanction. Since the emphasis in both cases is upon the conduct and not the state of mind of the actor, it follows that the distinction should be based upon the dangerousness of the conduct; that is, for a high degree of negligence the conduct must contain a greater risk of harm than is necessary to form a basis for tort liability only. This distinction is, in this code, made in three ways: (1) To be guilty of a crime based on a high degree of negligence the actor must create the risk while handling a dangerous instrumentality, that is, one which when handled carelessly is highly dangerous. Vehicles, firearms and burning material are examples. (2) His conduct must in general create a risk of serious consequences, e.g., death or great bodily harm; and (3) the chance of his conduct causing those consequences must be greater than would be required to sustain a verdict for damages in tort, that is, there must be a high probability that the consequences will result from his conduct. 'High probability' does not mean that the mathematical probability of the conse-

■■■■ We conclude that the high degree of negligence standard is an objective one. Paraphrasing *Osborne, supra*, the state was required to prove that the defendant did an act or failed to take such a precaution that under the circumstances present he, as an ordinarily prudent person, ought reasonably to have foreseen that he was thereby exposing another person to an unreasonable risk and high probability of death or great bodily harm. The scope of evidence properly admissible on this point is, in our opinion, no different than that admissible to prove ordinary negligence when in issue.

*Admissibility of Testimony Relating to Defendant's Driving:*

### 1. *Defendant's Driving on the Day the Accident Occurred.*

Defendant claims error in the admission of testimony by Nelson, Jaeger and Hoffman regarding defendant's conduct in driving from his place of work in Waukesha to the scene of the accident. He claims that this evidence was irrelevant, and in the alternative, that it should have been excluded by the court because its probative value was outweighed by the danger of prejudice and misleading the jury. Sec. 904.03, Wisconsin Rules of Evidence.[5]

quences occurring from the conduct must be greater than 50 per cent. It means simply that the probability would be considered great by the ordinary person, having in mind all the circumstances of the case, including the seriousness of the probable consequences." Comments, Judiciary Committee Report on The Criminal Code (Wis. Legislative Council 1953), sec. 339.25.

[5] Sec. 904.03, Wisconsin Rules of Evidence: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

The state argues that even if this evidence was not admissible to prove specific acts of negligence causing the accident, it was admissible to show that those acts reflected the "high degree" of negligence required by sec. 940.08, Stats., as an application of sec. 904.04(2), Wisconsin Rules of Evidence.[6] This latter view seems to have been taken by the circuit court in its decision on appeal:

"On a timely offer of proof the trial court concluded that the eyewitness observation of how the defendant operated his vehicle from the time he left work in Waukesha several miles away to the moment of the accident was admissible. On the offer of proof the determination of the court was that it be so limited to that trip. That ruling had precious little to do with habit and character but rather whether evidence of attitude, modus operandi and appearance of due care or lack of it five, ten and fifteen minutes before the accident was relevant to show negligence to a high degree in that it would cast some light on the question and be helpful to the jury in weighing and assessing other evidence. Out of this came evidence by the defendant as to how he and others were behaving on the highway: 'I don't drive any faster than what they do.' 'Well, do they drive too fast?' 'Oh yeah, Mr. Hoffman he drives quite fast down the highway.' Also, 'Did you give him a finger' 'Yes' 'Why?' 'Because that was common. If they weren't giving me the finger I was giving it to them.' The court did not err in determining this evidence to be relevant."

 The approach taken by the state and the circuit court must be rejected. The defendant's "attitude" was not an issue in this case. The evidence in question was not

---

[6] Sec. 904.04(2), Wisconsin Rules of Evidence: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

admissible under any of the exceptions to the character evidence rule stated in sec. 904.04(2), Wis. Rules of Evidence.

■ The question before us is whether the testimony as to the defendant's driving before reaching the scene of the accident was properly admissible to prove defendant's high degree of negligence or whether it should have been excluded as irrelevant or too remote.[7] In *Shapiro v. Klinker,* 257 Wis. 622, 626, 627, 44 N.W.2d 622 (1950), this court adopted the following from 1 Jones, *Evidence* (4th ed.), sec. 137:

" 'In determining a dispute concerning the relevancy of proffered evidence, the question to be resolved is as to whether there is a logical or rational connection between the fact which is sought to be proved and a matter of fact which has been made an issue in the case . . . .

" 'While remoteness in point of time does not necessarily render evidence irrelevant, it may do so where the elapsed time is so great as to negative all rational or logical connection between the fact sought to be proved and the remote evidence offered in proof thereof.' "

To the same effect is *Rausch v. Buisse,* 33 Wis.2d 154, 166, 146 N.W.2d 801 (1966). Rejection of evidence because of remoteness rests in the trial court's discretion. *Id.; Krause v. Milwaukee Mut. Ins. Co.,* 44 Wis.2d 590, 598, 599, 172 N.W.2d 181 (1969).

■■ A review of the cases indicates that the most important factor in determining admissibility of conduct evidence prior to the accident is the degree of probability that the conduct continued until the accident occurred. Thus the condition or conduct sought to be proven will strongly affect the degree of remoteness which may be acceptable. Speed may be quickly changed, as may position on the highway. However, intoxication or drowsi-

---

[7] *See* Annot. *Admissibility, in action involving motor vehicle accident, of evidence as to manner in which participant was driving before reaching scene of accident,* 46 ALR2d 9 (1956), for a collection of cases on the admission of evidence of prior driving.

ness are likely to persist much longer, and evidence of such conditions many miles or minutes before the accident may be proper. Where speed is concerned, some courts have stated the general principle to be that the earlier point should be close enough to permit the inference that the speed continued, or probably continued, up to the scene of the accident.

In *Hefele v. Rotter*, 197 Wis. 300, 222 N.W. 220 (1928), it was held proper to admit testimony that four to five miles before the accident the defendant was proceeding down the road in a zigzag path and appeared to be sleeping or nodding. The court observed that such drowsiness would be "much more apt to continue to the point of accident than is the speed at which the car was driven four or five miles, or even half a mile, from the point of collision." Similarly, in *Shapiro v. Klinker*, 257 Wis. 622, 626, 627, 44 N.W.2d 622 (1950), it was held error not to admit evidence indicative of intoxication five or six miles before the scene. In *Krause v. Milwaukee Mut. Ins. Co.*, 44 Wis.2d 590, 598–600, 172 N.W.2d 181 (1969), it was held within the trial court's discretion to admit evidence of who was driving a car some four hours before the accident, on the question of who was driving when the accident occurred. In *Rausch v. Buisse*, 33 Wis.2d 154, 166, 167, 146 N.W.2d 801 (1966), it was held a permissible exercise of discretion to refuse testimony as to skidmarks observed some six hours after the accident.

With respect to the issue of speed, the leading Wisconsin case appears to be *Ronning v. State*, 184 Wis. 651, 200 N.W. 394 (1924), in which this court reversed a conviction for fourth-degree manslaughter in the use of an automobile (a predecessor to the offense created by sec. 940.08, Stats.). The evidence under attack included the following: (1) testimony that the defendant had been driving 40 miles per hour about a mile from the accident (the speed limit then was 30 mph) ; (2) testimony that

the defendant had been driving "real fast" somewhat farther than one mile from the accident; and (3) testimony that the defendant had been going about 70 mph about three-eighths of a mile from the accident. All the evidence was rejected save (3), and even that was held insufficient to make out a prima facie case. 184 Wis. at 656–658. The *Ronning* case seems to indicate that at least where a factor tending to reduce speed, such as "a stretch of uneven and rough roads," intervenes, observations made at distances of a mile or so are not probative. "It is a well-known fact that an automobile in good condition can very readily and quickly be regulated as to speed." *Id.* at 656.

Other speed cases decided by this court include *Neumann v. Evans,* 272 Wis. 579, 585, 586, 76 N.W.2d 322 (1956) (Within judge's discretion to exclude estimate of speed about ¼ mile from the accident.) ; *Tofte v. Crolius,* 196 Wis. 608, 610, 612, 220 N.W. 225 (1928) (Error to allow testimony as to speed at which defendant passed witnesses' car over five miles before the point of collision, at least where witnesses did not keep vehicle in sight up to point of collision; however, in light of other evidence and admissions on the issue, not prejudicial.) ; *Fox v. Kaminsky,* 239 Wis. 559, 563, 564, 2 N.W.2d 199 (1942) (Prejudicial error to exclude testimony as to plaintiff's speed at a point 2,000 feet from accident where witness observed car up to point of accident and could testify that speed decreased, if anything, as accident site was approached.) ; *State v. Resler,* 262 Wis. 285, 288–289, 55 N.W.2d 35 (1952) (Witness estimated defendant's speed as he was passed about 1½ miles before the accident. The court said that if this were all, the evidence might have been inadmissible. But the witness continued down the road, at a speed of 40–50 mph, and arrived at the scene after defendant had gone off the road, gotten out of his car and flagged down the witness, per-

mitting reasonable inference that speed when witness was passed was approximately continuous thereafter.)

Here, Randy Nelson testified that he was going between 50 and 55, and the defendant passed him "quite easily" right before the church, which was about one-quarter mile from the accident. Nelson further testified that the defendant was going faster than Nelson was when the defendant passed Joe Sandvig in the curve, which is even closer to the accident. Sandvig estimated the defendant's speed when passing Sandvig at about 65 miles an hour and testified that defendant's speed continued after the pass. Thus Nelson's testimony relates entirely to conduct occurring within one-quarter of a mile or so from the scene, and between Nelson and Sandvig the defendant was under constant observation from the time he passed Nelson until the accident; and there is evidence that defendant's speed was continuous throughout that period. Under the cases cited above, it was clearly within the trial court's discretion to admit the testimony of Nelson, as well as Sandvig, regarding the defendant's speed.

The testimony of Jaeger and Hoffman is another matter. Jaeger (a passenger in the Hoffman car) said the defendant went "really roaring past us," and Hoffman put defendant's speed during the pass at "around 80." However, these two witnesses lost sight of the defendant some 12½ miles from the point of the accident, and did not see him again until reaching the scene. There was at least a 12-mile stretch before either Jaeger or Hoffman again saw the defendant. We think it was error to admit the testimony of Jaeger and Hoffman. There is no basis here for an inference that the defendant's speed, as estimated by Hoffman and Jaeger, continued to the point where the accident occurred.

Hoffman and Jaeger also testified that the defendant ran two stop signs and tailgated a truck, again at

points in excess of 12½ miles from the place where the accident occurred. This evidence is too remote to be relevant to the defendant's conduct at the scene for the same reasons as the evidence with respect to speed, but more fundamentally, there is no indication in this case that tailgating or failing to obey a stop sign were in any way involved with the accident. The evident purpose and probable effect of the testimony were to establish in the minds of the jury that the defendant was a careless driver on his way to the scene of the accident and was therefore likely to have driven negligently where the accident occurred.

We see no basis upon which Hoffman's and Jaeger's testimony as to defendant's conduct 12½ miles from the place where the accident occurred can be viewed as relevant or probative on the issue of his speed at the accident, and its admission cannot be sustained.[8]

## 2. *Defendant's Driving Over a Three-Month Period Prior to the Accident.*

Defendant contends that it was error to allow the witness Hoffman to testify as to the defendant's driving practices over the three-month period preceding the accident. The trial court had earlier ruled that no evidence going to such matters would be admitted, but in the case

---

[8] The state's brief interprets *Krause v. Milwaukee Mut. Ins. Co.*, 44 Wis.2d 590, 599, 172 N.W.2d 181 (1969), as rejecting the idea that *Ronning v. State, supra,* established a one-mile rule of thumb with respect to the admission of testimony of speed prior to an accident. The admissibility of remote evidence of speed is not to be reduced to a mathematical formula, and each case must be decided on its own facts according to the reasonableness of an inference that the observed speed continued to the point of the accident. In *Ronning* the court indicated that the one-mile testimony in that case "was not competent and . . . possessed no probative force." 184 Wis. at 656, 657. The validity of this decision as precedent is not undermined by our later decision in *Krause.*

of Hoffman, the state was allowed to go into the matter on redirect examination upon the theory that the defense had opened up the matter on cross-examination. The circuit court agreed, feeling that the defense had "opened the door on the avenue of bias, prejudice and credibility . . . ." On cross-examination defense counsel was attempting to get Hoffman to admit that he did not like the defendant. The relevant cross-examination relating to defendant's driving went as follows:

"*Q.* You don't like him [the defendant]; do you.
"*A.* I didn't—never said that.
"*Q.* No, but I'm saying that: Isn't that true, you don't like him?
"*A.* Well, not the way he drives. I don't have nothin' to do with that.
". . .
"*Q.* You never discussed him with other men prior to that date?
"*A.* No.
". . .
"*Q.* Discussed him and his habits and why you didn't like him.
"*A.* Oh, his habits.
"*Q.* Yes.
"*A.* What kind of habits?
"*Q.* Any kind of habits you didn't like.
"*A.* Driving habits, yeah.
". . .
"*Q.* Sir, I'm not trying to put words in your mouth. I just want the truth. Why don't you admit it, you never did like the guy—
"*A.* I never knew him that much.
"*Q.* Then why would you talk about him with your friends, if you didn't know him?
"*A.* When I see him go by me every day—
"*Q.* Did it irritate you because he grinned when he drove by you. Are you that thin-skinned, sir?
"*A.* And the speed he goes by me, and how he goes by me.
"*Q.* Did the grin get to you?
"*A.* No.

"Q. Kind of simmered to give you the finger; wasn't it.

"A. He gave me that lots of times.

"Q. Oh, he did?

"A. Yes.

"Q. So then you knew him; didn't you.

"A. Just when I seen him go by me.

"Q. And give you the finger.

"A. Oh, yeah.

"Q. Right. So you really didn't like him; did you. . . . How can you like a guy that gives you the finger?

"A. A lot of guys do it.

"Q. You didn't like him; did you. And you didn't like him giving you the finger; did you.

"A. No."

On redirect examination Hoffman testified that within three months of the accident he observed the following incidents on more than a half a dozen occasions: The defendant passed him on a hill, passed two cars, sometimes three at a time, and passed on curves in a no-passing zone.

On recross-examination defense counsel again attempted to show that Hoffman had, over a long period, spent a lot of time keeping track of the defendant and watching the defendant and his driving activities. The last question was "Is your testimony colored somewhat by your ill-feeling for Mr. Hart?"

The defendant claims that evidence as to defendant's driving which came out on cross-examination was volunteered unresponsively by the witness, so as not to constitute an "opening of the door," and that admission of the evidence was precluded by sec. 904.04, Wis. Rules of Evidence.

 ██ The testimony speaks for itself. It is true that the witness's initial comment on defendant's driving habits was gratuitous.[9] However, defense counsel persisted,

---

[9] There was some discussion in the trial court as to whether the pre-accident testimony was proper to show habit under sec. 904.06, Wis. Rules of Evidence, though neither the circuit court nor the state in its brief rely upon such a theory. Habit, in this

and we believe that by the time the witness mentioned the defendant's driving again it can fairly be said that he was responding to the question asked. On hindsight, the response which was forthcoming was predictable. No motion to strike the initial unresponsive answer or the responses relating to driving was made, although the defendant had previously objected to testimony concerning the defendant's driving prior to the day of the accident, which objection had been sustained. The state on redirect could attempt correction of any adverse implications flowing from cross-examination. The defense was obviously trying to discredit Hoffman by showing that he was biased against the defendant; and the state arguably had a right to explain further the witness's feelings along this line. The trial court possessed considerable discretion in defining the scope of redirect examination. *State v. Cydzik,* 60 Wis.2d 683, 690, 211 N.W.2d 421 (1973).

It appears as if the defendant took a calculated gamble—the defendant decided that it would be better to discredit the witness even at the risk of introducing his own driving conduct. The defense having drawn the witness out on the subject, under these circumstances, we think the trial court's exercise of discretion in allowing the additional inquiry by the state should be sustained.

However, Hoffman should not have been permitted to testify. As we stated above, all of Hoffman's direct testimony should have been excluded on grounds of remoteness. Though we have concluded that Hoffman's testimony on redirect concerning the defendant's driving habits in general was properly received, this testimony was admissible only on "a door-opening theory," and it is obvious that had Hoffman's initial testimony been

---

sense, is a "regular response to a repeated specific situation." McCormick, *Evidence,* sec. 195 (2d ed. 1972). We doubt the existence of a "habit" of due care or lack thereof. We believe we are dealing with character evidence, though the courts are not always careful to preserve the distinction between the two terms, and they can and do appear to overlap at times.

excluded, the events leading to his testimony on redirect could not have transpired.

### 3. Admissibility of Testimony Constitutes Reversible Error.

If the testimony of Hoffman and Jaeger regarding defendant's driving prior to the accident was improperly admitted, the logical next question is whether this error was harmless or requires reversal.

 Errors committed at trial should not overturn the conviction unless it appears the result might probably have been more favorable to the party complaining had the error not occurred. *Woodhull v. State,* 43 Wis.2d 202, 168 N.W.2d 281 (1969). In *Wold v. State,* 57 Wis.2d 344, 356, 357, 204 N.W.2d 482 (1973), a case involving improperly admitted evidence, the court said:

". . . The test of harmless error is not whether some harm has resulted, but, rather, whether the appellate court in its independent determination can conclude there is sufficient evidence, other than and uninfluenced by the inadmissible evidence, which would convict the defendant beyond a reasonable doubt. This test is based on reasonable probabilities. . . . A possibility test is the next thing to automatic reversal. In determining guilt 'beyond a reasonable doubt,' the human mind should not work on possibilities, but on reasonable probabilities." (Citations omitted.)

*See also State v. Dean,* 67 Wis.2d 513, 533, 227 N.W.2d 712 (1975).

After careful reading of the record, we believe that the testimony of Hoffman and Jaeger, taken as a whole, changed the basic tenor of the trial and raised a definite risk that the jury might convict to punish a person they perceived to be a generally bad actor where automobiles are concerned. Hoffman's and Jaeger's testimony constituted a substantial part of the total testimony heard by

the jury. The killing of an innocent, albeit careless, young boy is in itself likely to put a jury in a mood quite susceptible of prejudice, and we think it highly likely that the testimony of Hoffman and Jaeger was influential on the jury.

In *Fischer v. State,* 226 Wis. 390, 399, 276 N.W. 640 (1937), we said that as a general rule (subject of course to exceptions), receipt of evidence of the defendant's bad character or commission of specific disconnected acts is prejudicial error. We concluded in that case that upon a review of the record the defendant did not have a fair trial. We conclude similarly here.[10] "It may well be that the defendant is guilty of the offense charged against him, but he is entitled to a fair trial according to the established rules of procedure and principles of law." *Boldt v. State,* 72 Wis. 7, 17, 38 N.W. 177 (1888).[11]

### Sufficiency of the Evidence.

The state's burden at trial was to prove beyond a reasonable doubt that the defendant was negligent in high

[10] "From the time when advancing civilization began to recognize that the purpose and end of a criminal trial is as much to discharge the innocent accused as to punish the guilty, it has been held that evidence against him should be confined to the very offense charged, and that neither general bad character nor commission of other specific disconnected acts, whether criminal or merely meretricious, could be proved against him. This was predicated on the fundamental principle of justice that the bad man no more than the good ought to be convicted of a crime not committed by him." *Paulson v. State,* 118 Wis. 89, 98, 94 N.W. 771 (1903).

[11] Because the court is unanimously of the opinion that the admission of improper evidence here was not harmless error under the formulation of *Wold v. State, supra,* that formulation of the harmless error test is accepted for purposes of this opinion. However, this writer agrees with the concurring opinion of Mr. Justice HEFFERNAN in *Kelly v. State,* 75 Wis.2d 303, 249 N.W.2d 800 (1977), advocating a reconsideration of the *Wold* rule for the reasons stated therein.

degree and that a causal relationship existed between such negligence and the death of the victim. Defendant disputes the sufficiency of the evidence as to both elements. We reach this question notwithstanding the fact that a new trial is required for other reasons, because the double jeopardy clause of the Constitution may bar a second trial for an offense if a conviction is reversed for insufficiency of the evidence. *See State v. Detco, Inc.*, 66 Wis.2d 95, 223 N.W.2d 859 (1974).

Before a jury verdict may be overturned on appeal for insufficiency of the evidence,

". . . the evidence when considered most favorably to the state and the conviction must be so insufficient in probative value and force that it can be said as a matter of law that no trier of the facts acting reasonably could be convinced to that degree of certitude which the law defines as 'beyond a reasonable doubt.' " *Lock v. State*, 31 Wis.2d 110, 115, 142 N.W.2d 183 (1966).

The evidence, viewed most favorably to the verdict, establishes the following: The defendant overtook Sandvig in the turn at the base of the hill below the scene of the accident, going at a speed of 65 miles per hour. He was in a no-passing zone for at least part of this passing maneuver, and he continued up the hill maintaining the same speed. He did not see the victim until he reached the crest of the hill, though the victim was visible, had defendant been looking, at a considerably earlier point. He was in the process of returning to his own lane after passing Sandvig as he reached the hillcrest, and saw the bicyclist, and at that point, because he saw the bicyclist, he swung back to the left to give clearance. At this point the cyclist was still riding along the right-hand side of the pavement. The boy then simultaneously signaled a left turn and turned his bicycle into the road, was struck by defendant's car, and killed. The jury could believe that the defendant made no real effort to slow his vehicle until he saw the boy begin his turn.

The intersection where the collision occurred was marked for westbound traffic, and in any event, defendant was familiar with the road and knew or should have known that the intersection was there. The posted speed limit throughout this region was 55 miles per hour. The traffic on the day in question was heavy, and the road in this area had many curves and hills.

Though some of the foregoing was disputed, the jury could have found the facts described, and we believe the evidence adequately shows negligence in a high degree as defined by sec. 940.08(2), Stats. Passing a bicyclist in a no-passing zone may not always be negligent. However, in this case the defendant passed in an intersection at a high rate of speed, and the jury properly could have found that an ordinarily prudent person would not have done so, but rather would have seen the bicyclist earlier than defendant did, would have moderated his speed well in advance of the intersection, and would have allowed the bicyclist to clear the intersection before overtaking him. The jury could have found that in acting as he did the defendant should have realized that he created a situation of unreasonable risk to persons near the intersection.

Defendant's car was moving at 60 mph at the hillcrest by defendant's own admission, and if the risk of striking a human being on a bicycle at a speed such as this does not carry with it a high probability of death, it is difficult to imagine a situation that would.

As to causation, this court has adopted the "substantial factor" formulation of the test. If a party's negligence is a substantial factor in producing a victim's injury, he is liable therefore, and there may be more than one substantial causative factor in any given case. *Sampson v. Laskin*, 66 Wis.2d 318, 325, 224 N.W.2d 594 (1975); *Blashaski v. Classified Risk Ins. Corp.*, 48 Wis.2d 169, 174, 175, 179 N.W.2d 924 (1970). The jury was in-

structed accordingly; *see* Wis. J.I.—Criminal 1170.[12] Moreover, it is the general rule that where the state seeks to punish negligent conduct criminally, the contributory negligence of the victim is no defense. "While no doubt the entire circumstances surrounding the killing are proper for the consideration of the jury in determining whether or not the defendant was negligent, yet his criminal negligence, if it exists, cannot be wiped out by the fact that the deceased was also negligent." *Maxon v. State,* 177 Wis. 379, 386, 387, 187 N.W. 753 (1922). *See also State v. Pope,* 6 Conn. Cir. 712, 313 A.2d 84 (1972); *People v. Pociask,* 14 Cal.2d 679, 96 P.2d 788 (1939); Annot. *Negligent homicide as affected by negligence or other misconduct of the decedent,* 67 A.L.R. 922 (1930). It is undisputed here that the victim was negligent in turning from an improper position on the road, failing to keep an adequate lookout, and failing to signal in advance of his turn. The question here is whether, considering the victim's negligence along with the other

---

[12] The part of Wis. J.I.—Criminal 1170, dealing with causation reads:

"The third element of this offense requires that the relation of cause and effect exists between the death of . . . and the driving by defendant of the vehicle in a manner amounting to a high degree of negligence. You are instructed that a relation of cause and effect exists between such high degree of negligence and the death of . . . when such high degree of negligence was a cause of death. There may be more than one cause of death. The negligence of one person alone might produce it, or the acts or omissions of two or more persons might jointly produce it. Before such relation of cause and effect can be found to exist, however, it must appear that the high degree of negligence under consideration was a substantial factor in producing the death. That is to say, that it was a factor actually operating and which had substantial effect in producing the death as a natural result."

*See Ayala v. Farmers Mut. Automobile Ins. Co.,* 272 Wis. 629, 639, 640, 76 N.W.2d 563 (1956).

circumstances of the case, the jury could have found that negligence of the defendant was nevertheless an operative factor having a substantial effect in producing the victim's death.

The defendant argues that the boy's negligence was the entire cause—that even if the defendant had not been driving too fast the result would have been the same. The state argues that the defendant's negligence lay at least in part in passing the victim at high speed within the intersection and that these factors are clear causes of the accident and injury.

As the circuit court and the state point out, the reason behind the prohibition of passing in an intersection is related to protection of persons turning there. When it is considered that an intersection collision was here involved, we believe an adequate causal relation between the victim's death and the defendant's high degree of negligence appears. The sufficiency of the evidence to support the verdict is clear.

*By the Court.*—Order reversed and cause remanded for a new trial consistent with this opinion.