STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Stephen L. GRANT, Defendant-Appellant. †

Supreme Court

*No. 85–1137–CR. Argued November 25, 1986.—Decided June 11, 1987.*

(Also reported in 406 N.W.2d 744.)

† Motion for reconsideration denied.

For the plaintiff-respondent-petitioner the cause was argued by *Michael R. Klos,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the defendant-appellant there was a brief by *Mark J. Rogers* and *Angermeier & Rogers,* Milwaukee, and oral argument by *Mark J. Rogers.*

DAY, J. This is a review of an unpublished decision of the court of appeals dated February 12, 1986, which reversed Stephen L. Grant's (Defendant's) conviction on June 18, 1984, in the circuit court for Milwaukee county, Hon. Ralph G. Gorenstein, Circuit Judge, of the violation of two counts of second-degree sexual assault under sec. 940.225(2)(e), Stats., and one count of robbery, contrary to sec. 943.32.

The issue on review is: Did the court of appeals properly apply the harmless error test in reviewing an erroneous decision by the trial court to admit "other

acts" evidence consisting of Defendant's arrest for prowling?[1] We conclude that the court of appeals incorrectly applied the harmless error test. Properly applying the test for harmless error enunciated in *State v. Dyess,* 124 Wis. 2d 525, 370 N.W.2d 222 (1985), there is no reasonable possibility that the error contributed to the conviction and we determine that the admission of evidence of the arrest for the ordinance violation constituted harmless error. We therefore reverse the decision of the court of appeals.

On February 22, 1983, Defendant was charged with two counts of second-degree sexual assault and one count of robbery. The crimes with which he was charged took place on February 13, 1983.

At trial, the victim testified as to the events that occurred in the early morning hours of February 13, 1983. After having fallen asleep with a bedroom light and television left on, the victim was awakened at approximately 3:30 a.m. by a noise in the dining room. A man wearing a stocking cap and jacket entered the bedroom. The victim testified she had about twenty seconds in which to view the man prior to his switching off of the light and television.

The assailant approached the victim, placing his hand over her mouth and advising her that if she did not move she would not be hurt. After questioning the victim as to whether they were alone, the man demanded money, and the two proceeded side-by-side

---

[1]The arrest for prowling involved a violation of a city ordinance. Since such violation is only a forfeiture action, this did not constitute a "crime" under sec. 939.12, Stats., which provides:

> "**939.12 Crime defined.** A crime is conduct which is prohibited by state law and punishable by fine or imprisonment or both. Conduct punishable only by a forfeiture is not a crime."

to the dining room to retrieve the victim's wallet. They then walked into the kitchen to count the money.

Dissatisfied with the amount of money found, the man demanded more. The victim assured the man that this was all the money she had. The victim testified that she was threatened; the man kept telling her that if she looked at him he would kill her. In an effort to appease the assailant, the victim removed her eyeglasses. The victim testified that she was near-sighted and had no difficulty seeing objects near to her. The victim testified that she had no difficulty seeing the denominations of the bills removed from her wallet—two ten dollar bills and a one dollar bill. She also stated while on the witness stand that she could see the face of the court reporter without wearing her glasses. The distance between the court reporter and the victim while testifying was approximately one yard. In addition, she testified that since the living room, dining room, and kitchen were illuminated by a street light she had no difficulty seeing the assailant's face.

After walking to the front door and locking it, the assailant then took the victim to the bedroom. The man threatened the victim, stating: "[i]f you don't do what I ask you to do I'm going to hurt you." She was instructed to close her eyes and remove her clothes. The victim was then sexually assaulted.

At one point during the assault the assailant pulled aside the drape to look out the window. At this moment the victim glanced at him. This was the only time the victim looked at the man during the assault. After the assault, the man rummaged through some dresser drawers and then departed.

The victim called police and upon their arrival gave the following physical description of her assailant: he was a black male in his late teens to early twenties, about five foot eight inches tall, and weighed around 130 pounds. She then went to the police station and viewed fifty to sixty photographs, but did not identify any as the photograph of her assailant.

On February 21, 1983, the victim returned to the police station to view a lineup. She identified the Defendant, who was one of the five men in the lineup. The lineup took place following the Defendant's arrest for prowling. The Defendant is a black male, twenty-seven years old, five foot seven inches tall and weighs 140 pounds.

During the jury trial, the prosecutor sought to introduce evidence of Defendant's arrest on February 19, 1983, on an ordinance violation for prowling. A woman, standing inside her home, had observed Defendant peering in her window. The police were called and upon their arrival they also saw the Defendant peering into the window of the woman's house. Upon his arrest, Defendant had in his possession the name and address of the woman. The trial court allowed admission of evidence of the prowling violation pursuant to sec. 904.04(2) Stats.[2]

---

[2]Section 904.04(2), Stats., provides:

"**904.04 Character evidence not admissible to prove conduct; exceptions; other crimes.** ... (2) OTHER CRIMES, WRONGS, OR ACTS. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The trial court cited *State v. Pharr*, 115 Wis. 2d 334, 340 N.W.2d 498 (1983) for the two-part test to be used when consider-

On appeal, the state conceded that the trial court abused its discretion when it admitted evidence of the prowling violation. The court of appeals held that the trial court erroneously allowed the state to admit evidence of Defendant's arrest for prowling, and that the error was not harmless.[3] The judgment was reversed and the case remanded for a new trial.

ing the admissibility of other-acts evidence. The trial court found, under the first part of the test, that the evidence fit into one of the exceptions listed in sec. 904.04(2), Stats. The trial court concluded that the evidence was "relevant to show ... motive, opportunity, intent, preparation, plan." The trial court also noted: "I think this also shows the absence of mistake ... since here it was involved in at least the percursor [sic], or possible percursor [sic] to another similar act."

Under the second step, the court determines whether the probative value of the evidence outweighs its prejudicial effort. Section 904.03, Stats., provides:

"**904.03 Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In balancing the probative value versus prejudicial effect under sec. 904.03, Stats., the trial court concluded: "[t]his court feels that because of the nature of the event, the closeness of the time, the closeness of the description, the modus operandi; that the probative value is greater than the prejudicial value ...."

[3]The court of appeals noted that the trial court admitted the prowling evidence because the trial court was of the opinion that it showed the defendant "was caught in the act of committing an act similar to the prior sexual assault and robbery." The court of appeals cited remarks made by the trial judge at the postconviction motion hearing:

In determining whether the admission of the prowling evidence constituted harmless error, the court of appeals stated:

"We must now determine whether this error is harmless. The harmless error test is whether there is a reasonable possibility that the error contributed to the conviction. A reasonable possibility is a possibility sufficient to undermine our confidence in the outcome. As a general rule, the erroneous receipt of evidence of the defendant's bad character or his commission of specific disconnected acts is prejudicial error. The burden is on the state to show that there is no reasonable possibility that the error contributed to the conviction.

"Here the state has failed to carry its burden. It is reasonably likely that the jury, upon hearing the prowling evidence, convicted Grant not because the evidence proved his guilt beyond a reasonable doubt, but because it thought that Grant had the propensity to commit bad acts. This is the very

---

"For Mr. Grant to have picked out this lady to rape he obviously had to check over the premises, to look out, to plan to do all the things the cases talk about, and that's exactly the same thing he was doing six days later when he was caught. Exactly."

The court of appeals, observing that the sole issue at trial was identification, noted that in order for the prowling evidence to be relevant, it had to "make the fact of Grant's identification" either more probable or less probable. Reasoning that the fact the Defendant was later arrested for prowling did not make it any more probable that he committed the assault and robbery, the court held that the prowling evidence was irrelevant and that therefore the trial court abused its discretion in allowing the evidence to be admitted.

For purposes of this review, we assume the court of appeals is correct in holding the prowling evidence was inadmissible.

conclusion that sec. 904.04, Stats., seeks to prevent. The jury could have believed that Grant was indeed 'caught in the act' when he was arrested for prowling. Had the prowling evidence been excluded, it is reasonably possible that the outcome of the trial would have been different. Our confidence in the outcome of this trial is thus undermined." (Footnotes omitted). (Emphasis added.)

The instant case presents the single issue of whether the admission of other acts evidence constitutes harmless error.

The potential dangers in admitting other-acts testimony are well known. Our rules of evidence do not allow this type of evidence to be admitted merely to show that the Defendant had a propensity to commit the type of acts for which he is charged. In the instant case it is argued that the admission of the evidence of the prowling arrest may have influenced the jury in such a way that it was more easily led to resolve the identity issue and determine the matter of guilt based on the Defendant's apparent propensity to commit acts such as prowling, acts which are arguably related to the sexual misconduct with which he was charged.

While the error was potentially prejudicial to the Defendant, there remains the fact that there is substantial evidence, unrelated to the prowling evidence, which confirms the victim's identification of the Defendant. Courts turn to the harmless error test for guidance in these situations in assessing whether the error is sufficiently grievous that a new trial should result.

The harmless error test as set forth in *Dyess* contemplates that the "reviewing court must set aside

the verdict unless it is sure that the error did not influence the jury or had such slight effect as to be *de minimus.*" *Dyess,* 124 Wis. 2d at 541–542. The reviewing court must determine "whether there is a reasonable possibility that the error contributed to the conviction." *Id.* at 543. In assessing this, the focus should be on whether the error undermines the court's confidence in the outcome of the case. *Id.* at 545. We conclude that the outcome in this case was not undermined by the admission of the other-acts testimony.

This court has reviewed trial error by analyzing the error "in the context of the entire trial." *State v. Zelenka,* 130 Wis. 2d 34, 49, 387 N.W.2d 55 (1986). In *Zelenka,* this court applied the *Dyess* harmless error test to assess whether erroneous jury instructions could be deemed harmless. This court stated: "To make this determination, we do not view this instruction in isolation from the trial nor do we consider whether such an instruction could prejudice the verdict in some hypothetical trial. We view this instruction in the context of the entire trial." *Id.* at 49.

In the instant case the erroneous admission of the other-acts testimony must be viewed in a similar light. In *State v. Fishnick,* 127 Wis. 2d 247, 378 N.W.2d 272 (1985), the court applied the *Dyess* harmless error test to determine whether the erroneous admission of other acts evidence could be deemed harmless. As in the present case, application of the *Dyess* test involved the review of evidence presented at trial. An important part of the *Fishnick* harmless error analysis involved an assessment of the sufficiency of the evidence "untainted by the error." *See, Fishnick,* 127 Wis. 2d at 266–267. Viewing the error in the context of

the entire trial, and considering the strength of the untainted evidence, we conclude that the error was harmless.

As noted above, the chief issue at trial was identification. To a large extent, the jury had to depend on judging the credibility of the victim on the stand. It has been observed many times that credibility of witnesses is a matter best determined by the jury. The victim's testimony states that she was with the assailant for approximately thirty to forty-five minutes. She saw the assailant enter her bedroom, and was able to look at him directly for roughly twenty seconds. She walked through the house with the assailant, between rooms that were illuminated by a street light. She had removed her glasses, but her nearsightedness did not prohibit her seeing the assailant, who was in close proximity the entire time. She also saw his face again briefly during the assault. We note that the victim also listened to the man speak the entire time. The victim was able to judge the physical characteristics of the man based on direct physical contact. The victim did not identify the assailant at a police station photograph session but did identify the Defendant at a subsequent lineup. We find that the jury could have convicted Defendant based on the foregoing testimony. There is no reasonable possibility that the error contributed to the conviction.

We agree with the state that the other-acts evidence had little impact on the jury. This evidence constituted a very minor part of the prosecution's case. Our review of the record reveals overwhelming evidence supporting guilt.

We also note that an additional factor is present in the instant case which supports upholding the

conviction: a concern for the victim. As noted in *United States v. Mechanik,* 106 S. Ct. 938, 942 (1986):

> "The reversal of a conviction entails substantial social costs: it forces jurors, witnesses, courts, the prosecution, and the defendant to expend further time, energy, and other resources to repeat a trial that has already once taken place; *victims may be asked to relive their disturbing experiences.*" (Emphasis added.)

The United States Supreme Court has stated that "in the administration of criminal justice, courts may not ignore the concerns of victims" and the potential "ordeal" they would be forced and put through in a retrial. *Morris v. Slappy,* 461 U.S. 1, 14 (1982). Here there would be nothing gained in forcing the victim to relive the humiliating and degrading experience of a sexual assault. We, therefore, using the test in *Dyess,* reverse the decision of the court of appeals in this non-constitutional error case.

*By the Court.*—The decision of the court of appeals is reversed.

HEFFERNAN, CHIEF JUSTICE *(concurring).* The writer joins in the majority opinion but concurs for the purpose of expressing disagreement with the separate concurring opinion of Justice Day, which states dissatisfaction with the harmless error rule recently adopted in *State v. Dyess,* 124 Wis. 2d 525, 370 N.W.2d 222 (1985).

Quite aside from the broader policy reasons for not now switching to a new harmless error rule, I am troubled by the analysis which would discard the *Dyess* rule because of the dictionary's definitional difference between "possible" and "probable." *Dyess*

was formulated for the express purpose of escaping the enslaving yoke of semantics. It would indeed be absurd to say that the words, "possible" and "probable," are always synonymous. But what we said in *Dyess* was that henceforth, for the purpose of the application of the test, meanings of those words should make little difference, that we should look to the substance of the test. We pointed out therein that "there are few meaningful distinctions among the various formulations of the test for prejudice." P. 545. *Dyess* attempted to stress a common-sense approach to whether or not an error seriously undermined confidence in a verdict. We drew on the experience of this court which taught us "that the determination of whether the trial error was harmless is unaffected by the particular formulation of the harmless error test used." P. 543.

I fear that what the concurring opinion urges is that we resort to a "counting-the-angels-on-the-head-of-a-pin" logic or to an undue reliance on Webster's Dictionary. I also point out that anyone who thinks that "possible" and "probable" are discrete words with no congruent meanings will be promptly disabused of this idea after even a cursory examination of some of the meanings ascribed to these words in Burton's *Legal Thesaurus* (MacMillan 1980).

While I sympathize with, and agree with, Justice Day's quest for an ever better harmless error rule, that quest should put aside the assumption that the solution to this vexing problem is to be found in dictionary definitions. Any rule adopted, or to be adopted, by this court or others will only confirm the appropriateness of the nomenclature used by Chief Justice Traynor: "The Riddle of Harmless Error." No test is likely to be completely satisfactory. What is

harmless or prejudicial eventually comes down to a subjective judgment, no matter how carefully we attempt to hedge that subjective decision with recognizable guidelines. What this court needs is a consistent and predictable policy in handling questions of harmless error.

The effect of the concurring opinion is to place in doubt our present admittedly less than perfect harmless error rule. Perhaps we will now replace it with another formulation that will be equally subject to criticism and whose jurisprudential life will soon be terminated. Nothing in the briefs or oral arguments in the present case has suggested any dissatisfaction or argued for a change in *Dyess.* On the other hand, when *Dyess* was adopted, there was widespread and publicly acknowledged dissatisfaction with whatever harmless error rule we theretofore had. To my knowledge, there has been no widespread disagreement with the *Dyess* procedure.

Recognizing, as any reasonable person should, that there is indeed a "Riddle of Harmless Error," I believe the court should, in the effort to give some predictability and reckonability to this aspect of the law, stick with the present test of harmless error. Until or unless we can reach the conclusion, based on experience, that the *Dyess* rule, properly read, understood, and applied, fails to serve the purpose of seeing to it that criminal convictions are not set aside for trivial reasons but are set aside only where the right to a fair trial has been impaired, the *Dyess* rule should be preserved. The duty of this court to provide and assure some continuity and predictability mandates that there be no change in the rule unless we can, with some assurance, come up with a better rule that in likelihood can be applied with greater understand-

ing and consistency by the lawyers and the judges of this state. What the concurrence appears to propose is a rule that compounds whatever confusion may arise out of the present rule. I would suggest that whatever rule we have, or which we may adopt in the future, assuming it substantially meets the dual test of foregoing reversals for trivial errors but yet assuring fair trial, we stick with the rule and work with it if necessary to see to it that it is made workable and understandable.

I am authorized to state that JUSTICE BABLITCH joins in this concurrence.

DAY, J. (*concurring*). I concur with the results of the majority opinion. However, I write separately because the application of the "reasonable possibility" test under the facts of the instant case is especially disturbing. It makes little sense to equate the erroneous admission of evidence related to violation of a municipal ordinance with a violation of a constitutional right. I believe that the court's decision in *Dyess* to adopt a uniform test for constitutional and non-constitutional error was ill-advised and that the court should, at the first available opportunity, overrule *Dyess*. Although one of the *Dyess* majority, I would restate the law of harmless error in order to reinstate separate tests for constitutional and non-constitutional error.

While it is clear in the instant case that the error complained of did not affect the evidence of the trial under any test for harmless error, this type of error, i.e., non-constitutional error, should not be subject to the strict, "reasonable possibility" test of *Dyess*. This test is applied by the United States Supreme Court only to constitutional errors.

As noted, *Dyess,* abandoned distinctive tests for constitutional and non-constitutional error. Observing that "[t]here seems to be no special virtue in having different harmless error tests for constitutional error and non-constitutional error," a majority of this court stated:

> "We conclude that, in view of the gradual merger of this court's collective thinking in respect to harmless versus prejudicial error, whether of omission or commission, whether of constitutional proportions or not, the test should be whether there is a reasonable *possibility* that the error contributed to the conviction." *Dyess,* 124 Wis. 2d at 543. (Footnote omitted.) (Emphasis added.)

There appears to have been two reasons which prompted the *Dyess* court to conclude that a single harmless error test is appropriate. First, this court, as a matter of practice, has frequently resorted to a single test in cases involving both constitutional and non-constitutional error. *Id.* at 542.

The single test that has been used was originally formulated by the United States Supreme Court in *Kotteakos v. United States,* 328 U.S. 750 (1946), a case involving non-constitutional error. *Kotteakos* is generally cited for the United States Supreme Court's statement of the harmless error test for non-constitutional errors. Courts have relied on various statements of the test appearing in the *Kotteakos* opinion. The following is one of the key paragraphs:

> "[i]f, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a

59

specific command of Congress. But if one cannot say, without fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Kotteakos,* 328 U.S. at 764–765. (Footnote and citation omitted).

The *Dyess* court noted that the *Kotteakos* test had been adopted by this court in prior cases involving constitutional error, citing *State v. Poh,* 116 Wis. 2d 510, 529, 343 N.W.2d 108 (1984), *State v. Burton,* 112 Wis. 2d 560, 571, 334 N.W.2d 263 (1983), and *State v. Billings,* 110 Wis. 2d 661, 667, 329 N.W.2d 1982 (1983), as examples. 124 Wis. 2d at 542.

The *Dyess* court also noted that in a number of cases involving non-constitutional error this court has concluded that the proper test was whether there was a reasonable possibility that the error contributed to the conviction, citing *State v. Cartagena,* 99 Wis. 2d 657, 671, 299 N.W.2d 872 (1981), *Barrera v. State,* 99 Wis. 2d 269, 295, 298 N.W.2d 820 (1980), *Pohl v. State,* 96 Wis. 2d 290, 312, 291 N.W.2d 554 (1980), and *Novitzke v. State,* 92 Wis. 2d 303, 308, 284 N.W.2d 904 (1979), as examples. The *Dyess* court reasoned that these cases, using a "reasonable possibility" test, were applying, for all intents and purposes, the *Kotteakos* test. *Dyess,* 124 Wis. 2d at 542–543. Thus, the majority in *Dyess* concluded that this court has applied a single

test (the *Kotteakos* test), in cases involving both constitutional and non-constitutional error.

The second reason given by the *Dyess* court as to why a single harmless error test is appropriate is that "there is little practical difference between the formulations of harmless error" which this court has used. *Dyess,* 124 Wis. 2d at 543. This means that the conclusion as to whether harmless error exists is often "unaffected by the particular formulation of the harmless error test used." *Id.*

In arriving at its conclusion as to the correct test, the *Dyess* court took guidance from *Strickland v. Washington,* 466 U.S. 668 (1984). In *Strickland,* the court stated the test of prejudice which must be applied to determine whether reversal is required in cases of defective performance by counsel.

Under *Strickland,* the appropriate test for prejudice requires that: "the defendant ... show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. The *Strickland* Court stated: "when a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

The *Strickland* Court set forth the defendant's burden:

> "Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would

61

reasonably likely have been different absent the errors." *Id.* at 696.

The *Dyess* majority said that although *Strickland* phrased the test in terms of "reasonable probability," the United States Supreme Court's test "is substantively the same as ours." *Dyess,* 124 Wis. 2d at 544.

As noted in *Dyess,* "[t]his court for years has been struggling with methodology to rationalize upholding a conviction despite the acknowledgement that error has been committed." *Id.* at 540. Prior to *Dyess,* the leading case on harmless error analysis was *Wold v. State,* 57 Wis. 2d 344, 204 N.W. 482 (1973).

In *Wold,* a defendant convicted of sexual misconduct argued that erroneously admitted evidence constituted prejudicial error. The *Wold* court stated:

> "The test of harmless error is not whether some harm has resulted, but, rather, whether the appellate court in its independent determination can conclude there is sufficient evidence, other than and uninfluenced by the inadmissible evidence, which would convict the defendant beyond a reasonable doubt." *Wold,* 57 Wis. 2d at 356.

In arriving at this formulation of the test, the *Wold* court relied on three United States Supreme Court cases: *Fahy v. Connecticut,* 375 U.S. 85 (1963); *Chapman v. California,* 386 U.S. 18 (1967); and, *Harrington v. California,* 395 U.S. 250 (1969).

The *Wold* court noted that in *Fahy,* the harmless error test was stated in terms of "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Wold,* 57 Wis. 2d 344, n. 12, quoting *Fahy,* 375 U.S. at 86–87. Following the *Fahy* decision, the Court in *Chapman* held that "before a federal constitutional error can be

held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman,* 386 U.S. at 24. *Chapman* is the case generally cited for the United States Supreme Court's statement of the harmless error test for *constitutional* errors.

The *Wold* court noted that the formulations of the test in *Fahy* and *Chapman* were thought to be similar by the *Chapman* Court. *Wold,* 57 Wis. 2d at 357, n. 12, quoting *Chapman,* 386 U.S. at 24. The *Wold* court concluded: "[t]aking these two cases together, it seems the court is saying an error cannot be deemed harmless beyond a reasonable doubt where there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Wold,* 57 Wis. 2d at 357, n. 12.

The *Wold* court reasoned, however, that the subsequent *Harrington* case "exchanged the 'possibility' test of *Fahy* for one based on 'probability.'" *Id.* Thus, the test was "based on reasonable probabilities." *Wold,* 57 Wis. 2d at 356. In explaining the possibility/probability distinction, the *Wold* court noted: "[a] possibility test is the next thing to automatic reversal. In determining guilt 'beyond a reasonable doubt,' the human mind should not work on possibilities, but on reasonable probabilities." *Id.* at 356–357. (Footnote omitted.)[1] The *Wold* test was applied in a

---

[1]In his dissenting opinion in *Dyess,* Justice Steinmetz, who was joined by Justice Ceci, expressed his disagreement with the majority's decision to express the test in terms of "reasonable possibility" rather than "reasonable probability." Justice Steinmetz stated: "[r]easonable probability is a much better test than reasonable possibility." *Dyess,* 124 Wis. 2d at 553. *See also, State v. Leach,* 124 Wis. 2d 648, 674, n. 10, 370 N.W.2d 240 (1985).

number of cases, and the statement of the test experienced some variation.[2]

This court struggled with the *Chapman* "beyond a reasonable doubt" language as incorporated in the *Wold* test. In assessing the "degree of harm" caused by trial error, whether constitutional or not, the focus has typically been on the strength of evidence "untainted" by the error. In *Sheehan v. State,* 65 Wis. 2d 757, 223 N.W.2d 600 (1974), the defendant was denied his constitutional right to confrontation when the trial court allowed a deposition to be read at trial. The court held the error harmless, concluding that there was sufficient untainted evidence to sustain the conviction. *Sheehan,* 65 Wis. 2d at 767–768.

This approach was followed in *State v. Dean,* 67 Wis. 2d 513, 227 N.W.2d 712 (1975), *cert. denied,* 423 U.S. 1074 (1976), which involved the admission of inadmissible hearsay evidence. The *Dean* court stated: "[w]e conclude that because of other evidence offered in the trial that the receipt of this testimony constituted harmless error." *Dean,* 67 Wis. 2d at 533. A similar approach was used in *Ramaker v. State,* 73 Wis. 2d 563, 243 N.W.2d 534 (1976), where constitutional error had been committed through the *ex parte* reception of evidence, giving the defendant no notice or opportunity to respond. The *Ramaker* court concluded: "[i]n short, the error is harmless because this court can independently conclude that there is suffi-

[2]For example, in *Allison v. State,* 62 Wis. 2d 14, 29, 214 N.W.2d 437 (1974), this court, dealing with a constitutional error stated: "[a]pplying the rule of *Wold,* that error is harmless *unless the result would reasonably have been different,* we have no doubt that the error here is harmless." (Emphasis added.) This approach was also followed in *Rohl v. State,* 65 Wis. 2d 683, 701, 223 N.W.2d 567 (1974), a case involving constitutional error.

cient evidence, other than and uninfluenced by the unconstitutionally received evidence, which would warrant the revocation of Mr. Ramaker's probation." *Ramaker,* 73 Wis. 2d at 570.

*Kelly v. State,* 75 Wis. 2d 303, 249 N.W.2d 800 (1977), highlighted the uncertainty surrounding the *Wold* harmless error test and marked the departure of one of the members of this court from the *Wold* test. The error in *Kelly* involved the admission into evidence of a gun case and a box of shells which had been found upon a warrantless search of the bedroom of the defendant, an individual convicted of first-degree murder. The court concluded that the admission of this evidence constituted harmless error, relying on evidence "uninfluenced" by the inadmissible evidence. *Kelly,* 75 Wis. 2d at 316–317. In a footnote, the majority in *Kelly* remarked that: "[w]e decline to upset *Wold* in favor of *Kotteakos v. United States,"* but noted that "the improperly admitted evidence had 'but only slight effect,' *Kotteakos,* 328 U.S. at 764 and the result in this case would be the same under that test." *Kelly,* 75 Wis. 2d at 317, n. 3.

In his concurring opinion, Justice Heffernan doubted the correctness of the formulation of the harmless error rule in *Wold,* arguing that *Wold* erroneously placed "emphasis upon the admissible evidence rather than upon the alleged error." *Id.* at 321. Justice Heffernan noted that *Wold* should be reconsidered in light of *United States v. Agurs,* 427 U.S. 97 (1976), a case which sets forth a rule different from that adopted in *Wold.*[3]

---

[3]In *Agurs,* the Court identified as the "customary harmless error standard" the test set forth in *Kotteakos:* "[U]nder that standard when error is present in the record, the reviewing judge

Justice Heffernan wrote the opinion in *State v. Jennaro*, 76 Wis. 2d 499, 251 N.W.2d 800 (1977), where the defendant appealed his criminal conviction, in part, on the ground that the trial court erred in failing to grant defendant's motion for severance of defendant's trial from the trial of his co-defendant. The *Jennaro* court held the error to be harmless, offering the following statement on harmless error analysis:

> "Under *Chapman v. California*, 386 U.S. 18 (1967), the United States Supreme Court stated that, before a federal *constitutional* error can be held harmless, 'the court must be able to declare a belief that it was harmless beyond a reasonable doubt.'

must set aside the verdict and judgment unless his 'conviction is sure that the error did not influence the jury, or had but very slight effect.'" *Agurs*, 427 U.S. at 112, quoting *Kotteakos*, 328 U.S. at 764.

Uncomfortableness with the *Wold* test is evident in other cases. In *Hart v. State*, 75 Wis. 2d 371, 249 N.W.2d 810 (1977), the court dealt with the error of improperly admitted testimony. The court held the error not harmless, citing the *Wold* test, but also citing the following language: "[e]rrors committed at trial should not overturn the conviction unless it appears the result might probably have been more favorable to the party complaining had the error not occurred." *Hart*, 75 Wis. 2d at 394, citing *Woodhull v. State*, 43 Wis. 2d 202, 215, 168 N.W.2d 281 (1969). *See also, State v. Bowie*, 92 Wis. 2d 192, 204–205, 284 N.W.2d 613 (1979); *Novitzke*, 92 Wis. 2d at 308. Justice Abrahamson stated that since the court unanimously concluded that the error was not harmless under *Wold*, the *Wold* formulation would be "accepted for purposes of this opinion." *Hart*, 75 Wis. 2d at 395, n. 11. Justice Abrahamson went on to state that she advocated a reconsideration of the *Wold* rule. *Id.* Justice Abrahamson's reservations were expressed in later cases. *See, e.g., Micale v. State*, 76 Wis. 2d 370, 373, n. 2, 251 N.W.2d 458 (1977); *State v. Spraggin*, 77 Wis. 2d 89, 101, n. 9, 252 N.W.2d 94 (1977).

(at 24) This standard of *Chapman* was specifically reaffirmed in *Harrington v. California,* 395 U.S. 250, 254 (1969). Under the *Chapman* test, it is apparent beyond a reasonable doubt that the error complained of did not contribute to the guilty verdict in respect to Jennaro. Under the test apparently applicable to nonconstitutional error, set forth in *Kotteakos v. United States,* 328 U.S. 750 (1946), and recently restated in *United States v. Agurs,* 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976), the error is equally harmless, because it is clear that the error did not influence the jury or had only slight effect. See *Kelly v. State,* 75 Wis. 2d 303, n. 2.5 at 317, 249 N.W.2d 800 (1977), and concurring opinion at 321. Under any test, the error was harmless." *Jennaro,* 76 Wis. 2d at 509–510.

Here the *Jennaro* court explicity recognized that the *Chapman* test was to be used in instances involving constitutional error, while the *Kotteakos* test, focusing on whether the error influenced the jury or only had a slight effect, was to be used in assessing non-constitutional error. Despite the recognition of this distinction, the *Jennaro* court opted not to choose any single test, and concluded that the error was harmless "under any test." *Id.* at 510.

*Jennaro* was relied on in *Simpson v. State,* 83 Wis. 2d 494, 266 N.W.2d 270 (1978), where the court reviewed the erroneous admission into evidence of two photos of a murder victim. The *Simpson* court stated: "[w]e conclude, applying either the test adopted in *Wold,* 57 Wis. 2d [at] 356, or the test suggested in *Jennaro,* 76 Wis. 2d [at] 509–510, that the error was not prejudicial." 83 Wis. 2d at 507. *See also, Hammen v. State,* 87 Wis. 2d 791, 801, 275 N.W.2d 709 (1979).

The "under any test" approach seemed to be modified somewhat in *State v. Clark,* 87 Wis. 2d 804, 818, 275 N.W.2d 715 (1979), where the court held that the admission of testimony by the victim of a sexual assault that she had not had sexual intercourse prior to the incident in question constituted error. The court held that the error was "harmless under any test for *nonconstitutional* error." *Clark,* 87 Wis. 2d at 818. (Emphasis added.) The *Clark* court again raised the distinction between constitutional and non-constitutional error. The court noted: "[t]he defendant invokes the standard for harmless *constitutional* error. *See Chapman v. California,* 386 U.S. 18, 24 (1967). The error here was admission of testimony in violation of state law; this in no way rises to the level of deprivation of the right to a fair trial guaranteed by the sixth and fourteenth amendments." *Clark,* 87 Wis. 2d at 818, n. 3.

The "under any test" approach is also employed in *State v. Sarinske,* 91 Wis. 2d, 55, 280 N.W.2d 725; *Novitzke v. State,* 92 Wis. 2d at 308 and *Pohl.* In *Pohl,* the court compared various statements of the harmless error test, and appeared to have given up making any distinction among them.[4]

---

[4]The *Pohl* court outlines the harmless error test as follows:

"In *Hart v. State,* 75 Wis. 2d 371, 249 N.W.2d 810 (1977), this court held that:

"'Errors committed at trial should not overturn the conviction unless it appears the result might probably have been more favorable to the party complaining had the error not occurred. *Woodhull v. State,* 43 Wis. 2d 202, 168 N.W.2d 281 (1969).' *Id.* at 394. *See also: State v. Bowie,* 92 Wis. 2d 192, 284 N.W.2d 613 (1979).

"'Moreover, in *Novitzke v. State,* 92 Wis. 2d 302, 284 N.W.2d 904 (1979) this court set forth the test for harmless error as follows:

The distinction between the harmless error test for constitutional and non-constitutional errors arose again in *State v. Billings,* 110 Wis. 2d 661, 329 N.W.2d 192 (1983). In *Billings,* this court stated that the standard for determining whether *constitutional* error is harmless was found in *Chapman,* 386 U.S. at 24. 110 Wis. 2d at 666–667.

Following *Billings,* the court in *State v. Gavigan,* 111 Wis. 2d 150, 163, 330 N.W.2d 571 (1983) identified the *Wold* test as the standard for determining whether a *non-constitutional* error is harmless. *See also, State v. Ruiz,* 118 Wis. 2d 177, 198, 347 N.W.2d 352 (1984). The application of the *Wold* test was challenged by the dissenters in *Gavigan.* Justice Heffernan, in his dissent, stated: "[t]he *Wold* test is not whether there was sufficient evidence to convict

"'Errors committed at trial should not overturn the conviction unless it appears the result might probably have been more favorable to the party complaining had the error not occurred.' *Hart v. State,* 75 Wis. 2d 371, 249 N.W.2d 810 (1977). In *Wold v. State,* 57 Wis. 2d 344, 356, 204 N.W.2d 482 (1973), a case involving improperly admitted evidence, the court stated:

"'The test of harmless error is not whether some harm has resulted, but, rather, whether the appellate court in its independent determination can conclude there is sufficient evidence, other than and uninfluenced by the inadmissible evidence, which would convict the defendant beyond a reasonable doubt. *See Harrington v. California,* 395 U.S. 250, 89 Sup. Ct. 1726, 23 L. Ed. 2d 284 (1969). This test is based on reasonable probabilities.'

"'Other formulations of the harmless error test would require reviewing courts to set aside the verdict and judgment unless sure that error did not influence the jury or had but only slight effect. *Kelly v. State,* 75 Wis. 2d 303, 317, n. 3, 249 N.W.2d 800 (1977) and concurring opinion at 321.' *Id.* at 308." *Pohl,* 96 Wis. 2d at 311–312.

*See also, Barrera,* 99 Wis. 2d at 294–295.

without the tainted evidence, but whether the jury would have done so." *Id.* at 174. Claiming that the majority misapplied the *Wold* test, Justice Heffernan stated: "[t]his court in *Wold* clearly applied the test of harmless error in respect to its effect upon a jury and did not confine its scrutiny solely to the effect that the untainted evidence would have as regarded solely from the viewpoint of an appellate court." 111 Wis. 2d at 174, n. 2.

The foregoing brief sketch of this court's treatment of the harmless error test since *Wold* shows that: 1) the distinction between tests for constitutional and non-constitutional error has not always been preserved; 2) the court has stated the harmless error test in various ways; 3) the "under any test" approach reveals not only imprecision in language, but frustration with the harmless error methodology; and 4) even when agreeing on the proper formulation, this court often has disagreement on the elements of the test, and how the test is to be applied. It was against this background that the *Dyess* court addressed the question of harmless error analysis.

The decision in *Dyess* to adopt a single uniform test for harmless error appears to have resulted, in part, from both dissatisfaction with this court's treatment of trial court errors in earlier cases, as well as a desire to set forth a clear rule that can be simply employed. The uniform test for harmless error had been advocated by Chief Justice Roger Traynor of the Supreme Court of California:

> "Constitutional though it may be to impose different tests for errors that are not of constitutional dimension and errors that are, each new test brings new complications to appellate review, which may do less to serve justice than to impede

it. For the long run it would be much better to evolve a uniform test that could realistically govern errors of constitutional or nonconstitutional dimension, in both civil and criminal cases. Since trials are often marred by both constitutional and nonconstitutional errors, an appellate court can hardly perceive the record whole if it must constantly adjust its sights to various degrees of probability as it scrutinizes various types of error. Such busy work not only befuddles its vision but causes a court to lose sight of the main objective. The real problem of justice is not whether an error is of constitutional or nonconstitutional dimension or whether it mars a criminal or a civil trial, but whether it affected the judgment." R. Traynor, *The Riddle of Harmless Error,* 48–49 (1970).

Wigmore also advocates a uniform standard. 1 J. Wigmore, *Evidence,* Sec. 21 (3d ed. 1940). *See also,* Comment, *Harmless Error: The Need for a Uniform Standard,* 53 St. John's L. Rev. 541 (1979). As noted by the author of the foregoing Comment:

"Although, as a general rule, constitutional violations may be more egregious than other types of errors, the circumstances of a particular case may render the nonconstitutional error far more prejudicial .... Since 'the effect of the evidence in the context of [a] particular case' bears little relation to whether the error is constitutional or nonconstitutional, there seems to be little justification for a rule which makes the determination of harmlessness hinge on the label attached to the error." 53 St. John's L. Rev. at 559 (footnotes omitted).

The constitutional/non-constitutional distinction has been criticized on the ground that "it is erroneous to say that constitutional errors are more likely to

have an injurious effect at trial than other errors." Saltzburg, *The Harm of Harmless Error,* 59 Va. L. Rev. 988, 1025 (1973). Professor Saltzburg argues for two distinct tests for harmless error, but the type of test should depend on whether the case is an appeal from a civil or criminal trial, and should not be related to the type of error involved. He states:

> "The basis for requiring a different standard for judging the effect of a procedural error in criminal and in civil trials is that a different standard of proof is utilized in the two kinds of cases, and that the standard of proof utilized at trial should relate in large measure to the standard used by an appellate court in evaluating the impact or potential harm of any trial error." 59 Va. L. Rev. at 991.

In discussing the arguments in favor of a uniform test, Saltzburg notes that Wigmore advocated a uniform test due to a desire to reduce the number of criminal convictions overturned on appeal, and did not consider the different burdens of proof in criminal and civil cases and whether that difference should play a part in assessing error. *Id.* at 995. Saltzburg observes that Justice Traynor did recognize the "relationship between burden of proof in the trial court and the standards of review on appeal," but only with respect to questions involving sufficiency of evidence and not questions related to review of error. *Id.* at 995–996. Saltzburg concluded that "aside from abstract notions of symmetry or an unsubstantiated assumption that a single standard is more easily applied, [Justice Traynor] supplied no more justification for uniformity in both kinds of cases. Indeed there appears to be none." *Id.* at 997. (Footnote omitted.)

Since questions of harmless error often involve constitutional rights under the United States Constitution, the starting point, when considering any formulation of the harmless error test, must be with what is minimally required when dealing with federal constitutional rights. In *Chapman,* the United States Supreme Court stated:

> "The application of a state harmless-error rule is, of course, a state question where it involves only error of state procedure or state law. But the error from which these petitioners suffered was a denial of rights guaranteed against invasion by the fifth and fourteenth amendments .... Whether a conviction for crime should stand when a State has failed to accord federal constitutionally guaranteed rights is every bit as much of a federal question as what particular federal constitutional provisions themselves mean, what they guarantee, and whether they have been denied." 386 U.S. at 21.

In adopting a uniform test for harmless error, a state must therefore construct the test so that it meets the United States Supreme Court's test for constitutional error. *See,* Comment, *Confusion in the Court—Wisconsin's Harmless Error Rule in Criminal Appeals,* 63 Marq. L. Rev. 643, 659 (1980). The test enunciated in *Dyess,* i.e., whether there is a reasonable possibility that the error contributed to the conviction, amounts to the *Chapman* harmless error test for constitutional error. The *Chapman* Court stated:

> "There is little, if any, difference between our statement in *Fahy v. Connecticut* about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a

constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman,* 386 U.S. at 24.

As stated previously, the *Wold* court concluded that, in *Harrington,* the United States Supreme Court abandoned the "possibility test" and exchanged it for a test based on "reasonable probabilities." An analysis of the *Harrington* case as well as subsequent United States Supreme Court opinions reveals that *Wold* was incorrect and that the *Chapman* test for constitutional error is still phrased in terms of reasonable possibilities.

In a recent case, *Morris v. Mathews,* 106 S. Ct. 1032 (1986), the United States Supreme Court dealt with a violation of the Double Jeopardy Clause. A five member majority held that "when a jeopardy-barred conviction is reduced to a conviction for a lesser included offense which is not jeopardy-barred, the burden shifts to the defendant to demonstrate a reasonable probability that he would not have been convicted of the non-jeopardy-barred offense absent the presence of the jeopardy-barred offense." *Id.* at 1038. In treating a violation of the Double Jeopardy Clause, the majority was not applying any harmless error test, since it did not consider the case to be a "'harmless error' case." *Id.* at 1037. In defining reasonable probability, the *Morris* majority looked to *Strickland. Id.* at 1038.

Four members of the court, however, agree that that case could have been treated as a "'harmless error' case." *Id.* at 1040 (L. Blackmun, J., concurring).[5]

---

[5]Justice Blackmun was joined in his concurrence by Justice

The violation or error which occurred was constitutional in nature and thus the *Chapman* test should apply. *Id.* Those four Justices reaffirm that the *Chapman* "harmless beyond a reasonable doubt" standard is essentially the same as the *Fahy* "reasonable possibility" standard, and that it is the latter test—one of reasonable possibilities—that is appropriate in cases involving constitutional error.

It is clear that the uniform test adopted in *Dyess* is the traditional test for constitutional error. Applying this test to cases involving nonconstitutional errors, cases may be reversed in instances where a reviewing court may conclude that there was a reasonable possibility that a nonconstitutional error contributed to the result. This situation may be unacceptable given the original purposes of the harmless error rule and the purposes it continues to serve.

It does well to keep in mind the history behind the evolution of the harmless error rule. Wigmore expressed his frustration at the American courts' adoption of the "Exchequer rule," garnered from the early case of *Crease v. Barrett,* 1 C.M. & R. 919, 149 Eng. Rep. 1353 (Ex. 1835), and the use of that rule in such a way so as to overturn cases on the most trivial technical errors. He notes:

> "Whether in civil or criminal cases, it has done more than any other one rule of law to increase the

Powell. Justice Brennan and Justice Marshall each wrote separate dissents. 106 S. Ct. at 1044. Justices Blackmun, Powell, and Marshall all agree that the harmless error test should have been applied and that the correct test was one of the reasonable possibility. Justice Brennan stated that there should be only one prosecution. *Id.* However, assuming a second prosecution was permissible, the proper test for determining whether respondent was entitled to a new trial was as stated by Justice Blackmun. *Id.*

delay and expense of litigation, to encourage defiant criminality and oppression, and to foster the spirit of litigious gambling .... That the law has gone to the extremes of absurd and provoking technicality in applying this rule is plain enough even in a casual glance through the reports .... Just so long as an erroneous ruling on evidence, however, trifling, is described by the highest judges (and in many courts it habitually is) as 'working a reversal,' just so long will the reproach of technicality and futility mark our litigation." 1 J. Wigmore *Evidence* Sec. 21, p. 891 (Tillers rev. 1983).

*See also,* Mause, *Harmless Constitutional Error: The Implications of Chapman v. California,* 53 Minn. L. Rev. 519 (1969); Comment, *Harmless Error: The Need for a Uniform Standard,* 53 St. John's L. Rev. 541, 543 (1979).

This court should not employ a harmless error test which would result in the overturning of a great number of cases on the grounds that a nonconstitutional error could not pass a harmless error test which the United States Supreme Court has said only constitutional errors need be subjected to. As noted by Justice Traynor: "The practical objective of tests of harmless error is to conserve judicial resources by enabling appellate courts to cleanse the judicial process of prejudicial error without becoming mired in harmless error." Traynor, at 81.

I am persuaded that the purposes underlying the harmless error rule are best served by preserving distinctive tests for constitutional and non-constitutional error. There are two primary reasons for retention of the distinctive tests. First, courts must be concerned with the integrity of the outcome of trials. Determining whether an individual received a fair

trial is essentially a matter of judgment. In distinguishing between constitutional and non-constitutional error, the underlying assumption is that constitutional errors should undergo greater scrutiny since a violation of a constitutional right would likely have a more injurious effect than commission of a non-constitutional error.

Second, constitutional rights are of fundamental importance and deserve heightened protection. *See, Lane,* 106 S. Ct. at 730, n. 9 (Court notes "heightened regard" for constitutional protections). It is harder to countenance the affirmance of a judgment which is based on constitutional error, not only because the constitutional error may have indeed contributed to the result based on the fundamental and pervasive nature of constitutional rights in general, but because upholding the result impliedly approves the violation of the constitutional right.

The foregoing reasons, while they suggest a high standard for constitutional error, also suggest that non-constitutional error should receive a less intense review. The likelihood that non-constitutional error contributed to or determined a verdict may be less, and the rights implicated are not of the same magnitude. Moreover, in applying the higher constitutional standard to non-constitutional errors, it is likely that a host of lesser technical errors may be swept in as having affected the determination of the verdict at trial. This result is at cross-purposes with the harmless error test and its underlying rationale: eliminating prejudicial error but not becoming bogged down in endless formulas for determining harmless error.

I disagree with the conclusion reached by the majority in Dyess that there is no difference between our use of the "reasonable possibility" test and the

United States Supreme Court's use of the "reasonable probability" test:

> "Although the [United States Supreme] Court uses the words 'reasonable probability' of a different outcome, in contrast to our use of 'reasonable possibility,' it is clear from the *Strickland* opinion that the Supreme Court's test is substantively the same as ours." *Dyess,* 124 Wis. 2d at 544.

The meaning conveyed by the "reasonable possibility" and "reasonable probability" tests is not the same. Their meaning depends, in turn, on the meaning of the words "possible" and "probable." There is a distinction in meaning between these words.

Possible is defined in *Webster's Ninth New Collegiate Dictionary* 918 (1983):

> "Possible. 1. to be able—more at POTENT; a: being within the limits of ability, capacity, or realization b: being what may be done or may occur according to nature, custom, or manners. 2. a: being something that may or may not be true or actual (explanation). 3. having an indicated potential (a housing site)."

Probable is defined in *Webster's Ninth New Collegiate Dictionary* 937 (1983) as:

> "Probable. to test, approve, prove—more at PROVE (1606). 1. supported by evidence strong enough to establish presumption but not proof (a hypothesis) 2: establishing a probability (evidence) 3: likely to become true or real (events)."

*Dyess* relied on *Strickland* to conclude that there was no difference between the probability and possibility tests. This reliance was misplaced. *Strickland* was not concerned with the harmless error test. As

noted by Justice Blackmun in his concurring opinion in *Morris, Strickland* "did not concern the adequacy of a proffered remedy for an acknowledged constitutional violation. The question in *Strickland* was whether there had been a constitutional violation in the first place." *Morris,* 106 S. Ct. at 1041. (Blackmun, J., concurring.)

The United States Supreme Court has maintained a distinction between tests for constitutional and non-constitutional error. In *Connecticut v. Johnson,* 460 U.S. 73 (1982), Justice Stevens expressly stated that: "the harmless-error rule which may be applied when federal constitutional error has been committed, see *Chapman v. California* ... is not to be confused with either the federal harmless-error rule that is applied in federal courts when non-constitutional error occurs, see *Kotteakos* ... or with a State's own harmless-error rule applicable to errors of state law ...." 460 U.S. at 88, n. 2 (Stevens, J. concurring).

One of the key problems in dealing with harmless error tests is that there is a crucial difference between formulating the test into a concise statement and then crafting a practical approach which correctly implements that test. This problem was something that the *Dyess* court apparently thought best solved by the adoption of a single test. Commentators have noted that the United States Supreme Court has employed various approaches in harmless error analysis, despite the fact that the same test was being used. *See,* Note, *Harmless Constitutional Error: An Analysis of Its Current Application,* 33 Baylor L. Rev. 961 (1981); Field, *Assessing the Harmlessness of Federal Constitutional Error—A Process in Need of a Rationale,* 125 U. Pa. L. Rev. 15 (1976); Comment, *Harmless Error: The*

*Need for a Uniform Standard,* 53 St. John's L. Rev. 541 (1979).

In the area of constitutional error, the United States Supreme Court appears to have employed three different approaches. As noted by one commentator, the Court has:

> "(1)   Focused exclusively on the erroneously admitted evidence to decide whether it contributed to the conviction;
>
> "(2)   Determined whether overwhelming evidence of guilt exists absent the constitutional error; and
>
> "(3)   Examined the record to decide whether the unconstitutionally obtained evidence is 'merely cumulative' of some other admissible evidence." 33 Baylor L. Rev. at 962 (Footnote Omitted.)

As demonstrated earlier, this court has similarly employed various approaches in implementing harmless error tests.

In assisting a reconsideration of the harmless error test, it is helpful to consult recent pronouncements by the United States Supreme Court on the subject. The recent case of *United States v. Lane,* 106 S. Ct. 725 (1986) sheds light on the state of the Court's harmless error jurisprudence.

In *Lane,* a father and son, James and Dennis Lane, were indicted on multiple counts for mail fraud, conspiracy, and perjury in connection with insurance claims that were made and that insurers paid for fire damage to a restaurant and duplex that James had hired a professional arsonist to burn. Prior to trial, the Lanes made motions for severance, contending that the charged offenses were misjoined in violation of Federal Rules of Criminal Procedure, 8(b), but the

motions were denied and the trial proceeded jointly before a jury.

On appeal, the Fifth Circuit Court of Appeals concluded that one of the counts should not have been joined with the others; it was held the misjoinder was prejudicial *per se* and the court reversed the convictions and remanded for new trials. 106 S. Ct. at 728–729. The Supreme Court granted certiorari to determine whether a misjoinder under Rule 8 is subject to the harmless error rule. *Id.* at 727.

The *Lane* Court notes that there are federal rules and statutes which deal with the topic of harmless error.[6] Rule 52(a) of the Federal Rules of Criminal Procedure provides:

> "RULE 52. HARMLESS ERROR AND PLAIN ERROR. (a) **Harmless Error.** Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

---

[6]Wisconsin has its own "harmless-error statute." Section 805.18, Stats., provides:

> "**805.18 Mistakes and omissions; harmless error.** (1) The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party.

> "(2) No judgment shall be reversed or set aside or new trial granted in any action or proceeding on the ground of drawing, selection or misdirection of jury, or the improper admission of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure a new trial."

This section has been applied in both civil and criminal cases. *See Dyess,* 124 Wis. 2d at 547.

In addition, there is a "harmless error" statute, 28 U.S.C., sec. 2111, which provides:

> **"Sec. 2111. Harmless error.** On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."

In *Lane,* the Court relied on Rule 52(a) and sec. 2111 since "the specific joinder standards of Rule 8 are not themselves of constitutional magnitude." 106 S. Ct. at 730. (Footnote omitted.)

The *Lane* Court noted that, in *Kotteakos,* the Court construed a harmless error statute with language similar to that seen in Rule 52(a), and observed: "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Lane,* 106 S. Ct. at 732, quoting *Kotteakos,* 328 U.S. at 765. *Lane* invoked the *Kotteakos* test, holding that "an error involving misjoinder 'affects substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 732, quoting *Kotteakos,* 328 U.S. at 776. In assessing the effect of the error, the *Lane* Court appeared to adopt an "overwhelming evidence of guilt" standard. The court concluded, "[i]n the face of overwhelming evidence of guilt shown here, we are satisfied that the claimed error was harmless." *Lane,* 106 S. Ct. at 732.

The *Lane* majority agreed with the dissent that the harmless error inquiry is different from a sufficiency of the evidence inquiry, stating: "[b]ut that does not in any sense mean that overwhelming evidence of guilt is irrelevant; the threshold of overwhelming evidence is far higher than mere sufficiency to uphold conviction." Id. at 732–733, n. 13.

Although *Lane* dealt with non-constitutional error, the Court also discussed *Chapman* and the test for harmless error involving constitutional error. In addressing the dissenters, the majority notes that "the standard for harmless error analysis adopted in *Chapman* concerning constitutional errors is *considerably more onerous* than the standard for non-constitutional errors adopted in *Kotteakos*. ..." *Id.* at 730, n. 9. (Emphasis added.)

In harmless error analysis, notes the *Lane* Court, "it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." *Id.,* quoting, *United States v. Hastings,* 461 U.S. 499, 509 (1983).[7] This review of the whole record is apparently required for all harmless error analysis, whether the error is constitutional or not. *Lane,* 106 S. Ct. at 731, n. 11.

---

[7]There are some constitutional errors which are cause for automatic reversal, and not subject to harmless error analysis. In *Delaware v. Van Arsdall,* 106 S. Ct. 1431 (1986), the Court noted that constitutional errors, "such as denying a defendant the assistance of counsel at trial, or compelling him to stand trial before a trier of fact with a financial stake in the outcome—are so fundamental and pervasive that they require reversal without regard to the facts or circumstances of the particular case." *Van Arsdall,* 106 S. Ct. at 1437.

Other recent cases in the United States Supreme Court show that the distinction between harmless error tests for constitutional and non-constitutional error has been maintained. In *Van Arsdall*, the error involved was of constitutional proportions, (the denial of defendant's opportunity to impeach a witness for bias which involved the confrontation clause) and the Court held the error to be subject to the *Chapman* harmless error analysis. 106 S. Ct. at 1438. The court outlined the nature of the test:

> "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.*

The *Chapman* test was also employed in *Hasting*. In *Hasting*, the Court reviewed the reversal of respondent's convictions because of prosecutorial allusion to their failure to rebut the government's evidence. 461 U.S. at 500. The *Hasting* Court formulated the harmless error inquiry as follows: "[t]he question a reviewing court must ask is this: absent the prosecutor's allusion to the failure of the defense to proffer evidence to rebut the testimony of the victims is it clear beyond a reasonable doubt that the jury would

have returned a verdict of guilty?" 461 U.S. at 510–511.

Harmless error analysis in Wisconsin should be based on the distinction between constitutional and non-constitutional error. The United States Supreme Court chooses to maintain this distinction, employing the *Chapman* test for constitutional error, and *Kotteakos* for non-constitutional error. I agree with this approach.

There are certain elements that the harmless error tests for constitutional and non-constitutional error have in common. First, in each test the reviewing court must take its own view of the record as a whole. Second, in assessing whether the error was harmless the court must determine the *probable impact* the error had in the minds of the jury. *See, Schneble v. Florida,* 405 U.S. 428, 432 (1972). Third, in looking at the impact that the error had on the jury, the court must imagine the impact on the hypothetical *average* jury, acting rationally.[8]

The foregoing makes clear that the method by which a reviewing court determines whether error is harmless is to assess the effect the error had on the jury's deliberations. Since the jury's chief job entails weighing the evidence, the reviewing court must also look to the evidence presented.

In setting forth the methodology by which reviewing courts look at evidence in a harmless error case, the United States Supreme Court has articulated

---

[8]As noted in *Harrington,* the judgment should be based on the Court's reading of the record and what would have been the probable impact of the error on the minds of an "average jury." 395 U.S. at 254. The Court rejected the argument that reversal was necessary if it could imagine a single juror who would have relied on the error for his or her vote. *Id.*

different tests. I would not distinguish among them but would instead adopt a combined approach. In reviewing the evidence presented, the court should look at the following factors:

1. Focusing on the error by itself, how much, if at all, did it contribute to the conviction? In cases of erroneously admitted evidence, the court would determine the importance of the evidence in the prosecutor's case.

2. Aside from the error, and any evidence that may have been admitted pursuant to it, is there overwhelming evidence supporting guilt?

3. Is there admissible evidence which would be considered cumulative to the evidence which may have been admitted as a result of the error?

Based on the foregoing determinations designed to help the court assess the significance of the error in the context of the evidence presented at trial, the court should then apply the standards for determining whether the error can be deemed harmless. Since the purpose of the harmless error test is to assess the probable impact of the error on the jury, the standard for both types of error is appropriately stated in terms of the degree of influence on the jury.

For constitutional error, the court should ask: Can it be said that the error had no more than minimal influence on the jury? If the error is thought to have more than minimal influence, then it is not harmless.

For non-constitutional error, the court should ask: Did the error substantially influence the jury? If it did substantially influence the jury, then it is not harmless.

As with other court-crafted tests, the tests here are not absolutely precise, nor scientific. However, they do provide a means to differentiate between the tests for constitutional and non-constitutional error.

The United States Supreme Court in *Chapman* stated the test for constitutional error as whether a reviewing court could hold that the error was harmless beyond a reasonable doubt. The test was restated as whether there is a reasonable possibility that the error contributed to the conviction. The minimal influence test mirrors the "reasonable possibility" and "harmless beyond a reasonable doubt" formulations of the test. It provides a means of measuring the effect of the error in a way that parallels the test for non-constitutional error: Both tests now assess the degree of influence on the jury.

The adoption of the minimal influence test would mean that errors which are trivial, inconsequential or insignificant are not grounds for holding the error not harmless. "Minimal influence" means that degree of influence which calls into question the basis upon which the jury reached its verdict, the fairness of the proceedings, and whether the violation of defendant's constitutional right should be tolerated.[9] The minimal influence test is a lower standard than the substantial influence test since the intent would be to give greater

[9]As stated by the United States Supreme Court:

"The harmless error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, *United States v. Nobles,* 422 U.S. 225, 230 (1975), and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Rose v. Clark,* 106 S. Ct. 3101, 3105–3106 (1986) quoting *Delaware v. Van Arsdall,* 106 S. Ct. 1431, 1436–1437 (1986).

protection to constitutional rights which are violated in the course of trial.

The constitutional error test is based on *Chapman*. The non-constitutional error test is based on the test enunciated in *Kotteakos*. The substantial influence test imposes a higher burden upon the party seeking to overturn a conviction on the grounds that there was a non-constitutional error committed. In applying this test, the reviewing court should determine whether the error was essential to the jury reaching its verdict.

The two distinct standards articulated above would preserve the difference between constitutional and non-constitutional errors, while at the same time serve the underlying purposes of the harmless error test.

I am authorized to state that JUSTICE DONALD W. STEINMETZ and JUSTICE LOUIS J. CECI join in this concurring opinion.

SHIRLEY S. ABRAHAMSON, J. (*concurring in part*). The issue for which we took this case, namely, the state's complaint that the court of appeals erroneously reversed a conviction by improperly applying the harmless error test, does not, as the state candidly admitted in its petition to review (p. 3), meet any of the specific criteria set out in Rule 809.62(1), Stats. 1985–86, for granting a petition for review. As it turns out, however, the case has raised for the court a significant issue of law upon which the court is divided. The issue of law is the validity of one of the court's holdings in *State v. Dyess,* 124 Wis. 2d 525, 370 N.W.2d 222 (1985), namely, that the test for harmless error does not turn on whether the error is of constitutional or non-constitutional magnitude (here-

after referred to as the *Dyess* issue). The state, the party involved in all criminal cases, has questioned the validity of the *Dyess* approach.

Unfortunately, the court decides the issue which does not meet the criteria for review and fails to decide the issue that does meet the criteria. Because the issue of harmless error arises in almost every criminal case in the circuit court, the court of appeals, and this court, I believe the court should decide the *Dyess* issue now and not leave it open, as it does in this case.

I recognize that the court raised the *Dyess* issue sua sponte in this case. The parties did not raise, brief, or argue the issue. I further recognize that this court should not decide cases on issues not raised, briefed or argued by the parties without giving the parties an opportunity to be heard. Of course in this case the court is deciding the case on the issue raised by the parties. It is therefore arguable that the court may decide the *Dyess* issue—which is not the determinative issue in the case—without affording the parties an opportunity to be heard. Nevertheless, I believe that the court would benefit from adversarial briefs on this important legal issue and that the court's resolution of the issue would, in all probability, be sounder with the benefit of counsels' assistance.

I conclude that the court should, as it has done in previous cases, order the parties to brief the issue the court has raised sua sponte and request amicus briefs so that the court can decide the *Dyess* issue promptly for the guidance of litigants, the circuit courts and the court of appeals. Accordingly, regardless of my position on the reversal of the decision of the court of appeals, I cannot join the majority opinion because it

does not address what has turned out to be the major legal issue presented in the case.

WILLIAM G. CALLOW, J. (*concurring*). Although I agree with the result reached by the majority, I write separately to express my concern with this court's prior adoption, in *State v. Dyess,* 124 Wis. 2d 525, 370 N.W.2d 222 (1985), of a single test for harmless error. In *Dyess* this court adopted a rule recognizing there was but a single test for harmless error without that issue having been raised, briefed, or argued by the parties. Because of the circumstances under which the single test for harmless error was adopted, I believe the test for harmless error is ripe for review.

I do not join Justice Day's concurrence because I reserve judgment on the proper harmless error test until this court is presented with a case in which the validity of the *Dyess* harmless error test is properly raised.